[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 19-14434

_____

RICHARD HUNSTEIN,

Plaintiff-Appellant,

*versus*

PREFERRED COLLECTION AND MANAGEMENT SERVICES, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-00983-TPB-TGW

_____

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER, and TJOFLAT,⋆ Circuit Judges.

GRANT, Circuit Judge, delivered the opinion of the Court, in which WILLIAM PRYOR, Chief Judge, WILSON, BRANCH, LUCK, LAGOA, BRASHER, and TJOFLAT, Circuit Judges, joined.

WILLIAM PRYOR, Chief Judge, filed a concurring opinion, in which TJOFLAT, Circuit Judge, joined.

NEWSOM, Circuit Judge, filed a dissenting opinion, in which JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges, joined.

GRANT, Circuit Judge:

In opinion after opinion, one standing issue continues to arise—what it takes to show concrete harm. That question was once tricky. But for this case and others like it, where the plaintiff alleges no harm besides the violation of a statute, the Supreme Court has cut a straightforward path. Like it or not, that path is ours to follow.

We have done so before. We recently held, en banc, that pleading a bare procedural violation of a statute was not enough, at least on its own, to establish concrete injury. And in that same case, we followed the Supreme Court's direction to consider

---

⋆ Senior Circuit Judge Gerald B. Tjoflat elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

common-law torts as sources of information on whether a statutory violation had caused a concrete harm. The comparison shed helpful light there; because two tort elements were missing from the statutory violation, no similar harm could be inferred between the two.

The Supreme Court has since ratified our approach. In *TransUnion*, the Court reiterated that harm from a statutory violation had to be "real" in order to be concrete, and that one way to tell if a harm is real is to compare it to a harm redressed in a traditional common-law tort. The Court also used the same approach that we did—comparing the elements—to determine whether the harm caused by a new statutory violation was similar to the one invoked by an old tort claim. When viewed as a way to evaluate whether actual harm occurred, this approach makes sense—if the elements do not match up, how could the harm that results from those elements?

Here, we walk that same path again. The plaintiff alleges that a creditor sent information about his debt to a mail vendor, which then sent him a letter on behalf of the creditor reminding him of the terms of the debt. Though he identified no specific harm in his complaint, he now claims that the debt collector's act caused him a concrete injury because it was analogous to the common-law tort of public disclosure. The problem with this theory is that his alleged reputational injury lacks a necessary element of the comparator tort—the requirement that the disclosure be *public*.

4                      Opinion of the Court                    19-14434

Without publicity, a disclosure cannot possibly cause the sort of reputational harm remediated at the common law.

The comparison to public disclosure of private facts is the sole basis on which the plaintiff rested his claim of concrete harm. Because that comparison fails, he cannot show any real harm, and we dismiss his complaint.

## I.

Richard Hunstein experienced a nearly inevitable frustration of modern American life—an expensive medical bill. When he did not pay, the hospital transferred the debt to a collection agency, Preferred Collection and Management Services. The agency, in turn, hired a commercial mail vendor to notify Hunstein that he needed to settle his debt. To that end, the collection agency sent its vendor several pieces of information, including Hunstein's name, his son's name, the amount of the debt, and the fact that the debt was incurred by Hunstein for his son's medical treatment. The vendor inserted the information into a prewritten form letter (on Preferred Collection's letterhead and with Preferred Collection's signature) and sent it along to Hunstein.[1]

Within days of receiving the letter, Hunstein filed suit. He alleged that Preferred Collection had disclosed information about

---

[1] These letters, a common feature of modern debt collection, are known as "dunning letters." That term comes from the verb "dun," a word of unknown origin meaning "[t]o importune (a debtor) for payment." *Dun*, The American Heritage Dictionary of the English Language 555 (5th ed. 2016).

his debt to a third party—the mail vendor—in violation of the Fair Debt Collection Practices Act.[2]  *See* 15 U.S.C. § 1692c(b).   The district court granted Preferred Collection's motion to dismiss, finding no violation because the communication to the mail vendor was not "in connection with the collection of any debt" as required for liability under the Act.  *Id.*  Hunstein appealed.

A panel of this Court reversed—but not before requesting supplemental briefing on standing.  *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 994 F.3d 1341, 1344–45 (11th Cir. 2021).  Our en banc decision in *Muransky v. Godiva Chocolatier, Inc.* had recently been issued, making it clear that Hunstein's suit could not survive a standing inquiry if he simply alleged a "bare procedural violation" of the Fair Debt Collection Practices Act.  *See* 979 F.3d 917, 921 (11th Cir. 2020).  *Muransky*, to be sure, was also clear that some statutory violations could cause a real harm that supported standing; we reiterated the Supreme Court's guidance from *Spokeo, Inc. v. Robins* that one way to evaluate such alleged statutory harms was by comparing them to traditional common-law tort claims.  *See id.* at 926 (citing 578 U.S. 330, 340–41 (2016)).

Because Hunstein had pleaded what could be characterized, at best, as an intangible harm resulting from a statutory violation,

---

[2] Hunstein brought two additional claims on statutory grounds, alleging violations of a different section of the Fair Debt Collection Practices Act and of the Florida Consumer Collection Practices Act.  *See* 15 U.S.C. § 1692f; Fla. Stat. § 559.72(5).  But he appeals only the dismissal of his § 1692c(b) claim.

the panel considered whether his alleged injury had a common-law analogue. It did—at least as the panel saw it. The majority opinion recognized that Hunstein had alleged neither a tangible harm nor a "risk of real harm," but held that his injury was concrete in any event. *Hunstein*, 994 F.3d at 1346–49 (quoting *Muransky*, 979 F.3d at 927). It was enough, the panel said, that his alleged harm had a "close relationship" to "invasion-of-privacy torts," especially "public disclosure of private facts." *Id.* at 1347 (quotations omitted). The panel also concluded, in what it treated as either a second or a separate stage in evaluating concrete injury, that Hunstein had the judgment of Congress on his side. *Id.* at 1348.

Before that opinion went into effect, the Supreme Court issued *TransUnion LLC v. Ramirez*, which drilled down on what a plaintiff must show to establish that an alleged intangible harm is a concrete injury. 141 S. Ct. 2190 (2021). The panel vacated its first opinion in light of *TransUnion*. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 17 F.4th 1016, 1020 (11th Cir. 2021). But it also issued a new one. The new opinion spent more energy on the standing analysis, but ultimately reached the same result—this time over a vigorous dissent.

The panel majority admitted that *TransUnion* "may seem—at least on its face—to be in some tension with" the conclusion that Hunstein had standing to bring his claim. *Id.* at 1031. Even so, at least by the lights of the majority, the allegation that "*some* measure of disclosure in fact occurred" was close enough to the tort of public disclosure to constitute a concrete injury. *Id.* at 1027,

1032. The dissent disagreed, arguing that such logic "swe[pt] much more broadly than *TransUnion* would allow." *Id.* at 1038 (Tjoflat, J., dissenting).

Following the revised opinion, our full Court voted to take the case en banc. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 17 F.4th 1103, 1104 (11th Cir. 2021). We now consider, in light of *Spokeo*, *Muransky*, and *TransUnion*, whether Hunstein has standing.

## II.

We review Article III standing de novo. *Muransky*, 979 F.3d at 923. A plaintiff must support "each element" of standing with "the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, at the motion-to-dismiss stage, a plaintiff must allege facts that, taken as true, "plausibly" state that the elements of standing are met. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1621 (2020); *see also Muransky*, 979 F.3d at 924 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

## III.

As we have explained, one of the "unexpected consequences of the common-law-analogy approach to identifying harms is the growing insistence on hammering square causes of action into round torts." *Muransky*, 979 F.3d at 931. That admonition finds new life in this case. Hunstein does his best to shove a nonpublic

transfer of information into a tort targeting public disclosure, but it just does not fit.

When considering whether an alleged intangible harm is concrete, or "real," we look to see if it matches up with a harm "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204. *Spokeo* offered, and *TransUnion* affirmed, a "simple instruction" about how to do so: "see if a new harm is similar to an old harm." *Muransky*, 979 F.3d at 931. Although an "exact duplicate" of a traditionally recognized harm is not required, the new allegations cannot be missing an element "essential to liability" under the comparator tort. *TransUnion*, 141 S. Ct. at 2209 (quotation omitted).

This guidance helps us heed our own warning to avoid "overthinking" the analysis. *Muransky*, 979 F.3d at 931. The new harm Hunstein alleges—a disclosure to a private party—is not similar to the old harm cited, disclosure to the public. That traditional tort requires publicity, and Hunstein alleges none. Without publicity, none of the exposure targeted by the tort of public disclosure is at play. He thus has failed to allege a concrete harm, and has no standing to bring his suit.

## A.

The reason it matters whether Hunstein has alleged a concrete harm, rather than simply a statutory violation, is that federal courts have limited jurisdiction. Under the Constitution, we only have power to resolve "Cases" and "Controversies." U.S.

Const. art. III, § 2.    Though three traditional doctrines govern whether a case or controversy exists—standing, ripeness, and mootness—standing has gotten the lion's share of the attention in recent cases.

The "irreducible constitutional minimum of standing" itself has three components: injury in fact, causation, and redressability. *Lujan*, 504 U.S. at 560–61.  Here, injury is the only one in question. Many of these cases spring from an allegation that a party has violated a federal statute—but not every statutory wrong causes an injury capable of supporting standing.  No doubt, the public has a shared interest in private companies complying with the law. *See TransUnion*, 141 S. Ct. at 2206.  That mutual interest, though, "cannot 'be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue.'" *Id.* (quoting *Lujan*, 504 U.S. at 576–77); *see also Carney v. Adams*, 141 S. Ct. 493, 499 (2020) (A "plaintiff cannot establish standing by asserting an abstract general interest common to all members of the public." (quotation omitted)).

In other words, "an injury in law is not an injury in fact." *TransUnion*, 141 S. Ct. at 2205.  Only an alleged harm that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" is enough to show that a party "has a case or controversy rather than, say, a strong and abiding interest in an issue, or a desire to obtain attorney's fees." *Lujan*, 504 U.S. at 560 (quotations omitted); *Muransky*, 979 F.3d at 924.

This appeal, like so many others of recent vintage, hinges on the concreteness requirement. An injury is concrete if it actually exists—that is, if it is "real, and not abstract." *Spokeo*, 578 U.S. at 340 (quotations omitted). A "bare statutory violation" is not enough, no matter how beneficial we may think the statute to be. *Muransky*, 979 F.3d at 936; *see also Spokeo*, 578 U.S. at 341. And the requirement that an injury be concrete is "essential to the Constitution's separation of powers" because it ensures that plaintiffs have a real stake in the actions they bring; it confines the courts to the business of deciding disputes between parties. *See TransUnion*, 141 S. Ct. at 2207.

The most obvious concrete harm is a physical injury or financial loss. But a plaintiff can also have a real stake—and therefore a real injury—when an alleged harm is intangible. *Spokeo*, 578 U.S. at 340. Congress is "well positioned to identify" those intangible harms, and when that body speaks by passing a statute that includes a cause of action for a particular harm, we find its judgment "instructive and important." *See id.* at 341. Indeed, we have understood since *Lujan* that "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Id.* (quoting *Lujan*, 504 U.S. at 578 (brackets omitted)).

But these authorities speak to Congress observing the existence of real-world injuries and creating federal causes of action

to redress them—not creating new injuries out of whole cloth.[3] Along those lines, the Supreme Court has cautioned that Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 141 S. Ct. at 2205 (quotation omitted). So congressional judgment, though instructive, is not enough. As we said in *Muransky*, the Constitution forbids the view that "once Congress has spoken, the courts have no further role." 979 F.3d at 933.

One way we deal with this tension between appropriately respecting congressional judgment and properly maintaining the boundaries of Article III jurisdiction is by comparing new causes of action to old ones. We ask "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 341. That kind of statutory violation, the Supreme Court has instructed, generally causes harm concrete enough to support standing. *See TransUnion*, 141 S. Ct. at 2204.

---

[3] Statutes creating a right to information are notable examples of where Congress may, in fact, do something that looks like creating an injury. But in those instances, a party has a right to a concrete thing—information. We will not digress on this point other than to say that the Supreme Court has set apart these informational injuries from the typical tangible injuries of physical injury and financial loss, and from those intangible injuries subject to the Court's comparative inquiry. *See, e.g.*, *TransUnion*, 141 S. Ct. at 2214; *Thole*, 140 S. Ct. at 1621 n.1.

This is the second time in two years that our Court, sitting en banc, has been tasked with deciding whether a plaintiff alleging a statutory violation has established Article III standing. In *Muransky*, we clarified *Spokeo*'s application to these sorts of harms in considerable detail. *Muransky*, 979 F.3d at 925–27, 929–30. Ultimately, we explained, the "key holding from *Spokeo*" is that "a 'bare procedural violation, divorced from any concrete harm' is not enough to establish an Article III injury." *Id.* at 929 (quoting *Spokeo*, 578 U.S. at 341). We also emphasized that, although the plaintiff there had not done so, a party could show that his cited statutory violation caused or qualified as a concrete harm by demonstrating a "close relationship" to a harm traditionally recognized in tort law. *Id.* at 931 (quotation omitted).

The Supreme Court reaffirmed both points in *TransUnion*. There, the Court doubled down on its decision in *Spokeo*, again stressing that harms must be concrete—"real"—to give rise to Article III standing. *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 340). It reemphasized that, for intangible harms, analogizing to longstanding torts is an important way to determine whether an alleged intangible injury meets the concreteness requirement. *Id.* at 2204–05. Particularly relevant here, it put more meat on the bones of that approach, adding that when an element "essential to liability" at common law is missing from an alleged harm, the common-law comparator is not closely related to that harm. *Id.* at 2209–10 (quotation omitted); *see also Muransky*, 979 F.3d at 932. As the Court explained, a theory that

"circumvents a fundamental requirement" of an analogous common-law tort "does not bear a sufficiently 'close relationship'" to establish standing. *TransUnion*, 141 S. Ct. at 2210 n.6.

But why are common-law torts even relevant? *TransUnion* endorsed the same theory that we articulated in *Muransky*: "The fit between a new statute and a pedigreed common-law cause of action need not be perfect, but we are called to consider at a minimum whether the harms match up between the two." *Muransky*, 979 F.3d at 926; *see TransUnion*, 141 S. Ct. at 2209, 2210 n.6. The reason, in short, that we consider traditional torts is because of the harm-to-harm comparison that they engender and elucidate.

The facts of *TransUnion*, which dealt with two separate classes of plaintiffs, themselves offer a helpful point of comparison and guide us as we work through this analysis. First, *TransUnion* found that—for purposes of comparing the class members' alleged harms to defamation—misleading information was close enough, element-wise, to false information. *TransUnion*, 141 S. Ct. at 2209. "The harm from being labeled a 'potential terrorist' bears a close relationship to the harm from being labeled a 'terrorist.'" *Id.* For plaintiffs whose credit reports were released to a third party, that was close enough; they had been harmed when misleading information was published. That's because "the harm from a misleading statement" bore "a sufficiently close relationship to the harm from a false and defamatory statement." *Id.* But for those plaintiffs whose credit files had not been shared with any creditors,

the story was different.  "[I]f inaccurate information falls into a consumer's credit file," the Court asked, "does it make a sound?" *Id.* (quotation omitted).

The answer was no.  Because the basis for the harm giving rise to a defamation claim was "the loss of credit or fame, and not the insult," only misleading information that was published could lead to a reputational harm like the one suffered after a defamatory statement.  *Id.* (quoting John Baker, *An Introduction to English Legal History* 474 (5th ed. 2019)).  In other words, though misleading information—like false information—can lead to unfair reputational harm if publicized, no reputational harm at all occurs when either sort of information is kept private.

*TransUnion* thus affirmed that this common-law tort comparison is not make-work for lower courts, and that when carrying it out we do not look at tort elements in a vacuum.  We make the comparison between statutory causes of action and those arising under the common law with an eye toward evaluating commonalities between the harms.  *See Muransky*, 979 F.3d at 926.

Though *TransUnion* has gotten the most attention, and has the most direct relevance to this case, we note that it is not the only time the Supreme Court has dealt with the concrete harm requirement after *Spokeo*.  In *Thole v. U.S. Bank N.A.*, for instance, the Court similarly rejected a comparison to a common-law cause of action and quickly dispatched the argument that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize

that person to sue to vindicate that right." 140 S. Ct. at 1620 (quoting *Spokeo*, 578 U.S. at 341). Again—no standing when the plaintiffs alleged a statutory violation that did not hurt them.

Cases since *Spokeo* have thus reiterated that an intangible harm is concrete only if it can be said to "exist in the real world," independent of a new statutory cause of action. *TransUnion*, 141 S. Ct. at 2205 (quotation omitted). *TransUnion* in particular has offered helpful detail on how to compare new causes of action and old torts. And that detail makes extra sense if we consider the comparison as part of the effort to evaluate whether an alleged harm is real; if an element from the common-law comparator tort is completely missing, it is hard to see how a statutory violation could cause a similar harm.

## B.

Applying these principles to the statutory violation alleged by Hunstein is an exercise in simplicity. The holdings of *Spokeo*, *Muransky*, and *TransUnion* are directly on point. Because the harm Hunstein now asserts lacks an element essential to its only plausible historical comparator, it lacks a close relationship with a traditional common-law tort. Hunstein has alleged no other basis for standing and his case must be dismissed.

We first identify the precise harm at issue. Hunstein alleges that, rather than preparing a mailing on its own, Preferred Collection sent information about his debt to a mail vendor, which then populated the data in a form letter. That act, according to

Hunstein, violated the statutory prohibition on communicating, "in connection with the collection of any debt, with any person other than the consumer." 15 U.S.C. § 1692c(b).

What harm did this alleged violation cause? Hunstein's complaint does not say. Even now, he points to nothing tangible like financial loss or physical injury. See Muransky, 979 F.3d at 926. Instead, he says that by sending the information about his debt to the mail vendor, Preferred Collection committed an act similar to the tort of public disclosure. The problem with this comparison is evident from the start: the disclosure alleged here lacks the fundamental element of publicity. And without publicity, there is no invasion of privacy—which means no harm, at least not one that is at all similar to that suffered after a public disclosure.

It is no surprise that one element of "public" disclosure is publicity; the others, for information's sake, are that the publicity concerns a matter in the private life of another, that it is highly offensive to a reasonable person, and that the disclosed information is not of legitimate public concern.[4] See, e.g., Cox Broad. Corp. v. Cohn, 420 U.S. 469, 489, 492 (1975). Only a person "who gives publicity to a matter concerning the private life of another" is liable. Restatement (Second) of Torts § 652D (Am. L. Inst. 1977)

---

[4] The dissent is incorrect when it asserts that the question we consider here is the only point up for debate. See Dissenting Op. at 5; see also Hunstein, 17 F.4th at 1041–44 (Tjoflat, J., dissenting); Concurring Op. at 1. But because the lack of publicity is dispositive, we need not go further.

19-14434                 Opinion of the Court                           17

(emphasis added).  Indeed, the harm at the core of the tort is based not on the fact that embarrassing information exists, but that the public knows about it.  So without publicity, there can be no public disclosure.  Unlike the near-falsity that was sufficiently close to defamation in *TransUnion*—because it gave rise to a similar reputational harm—communications that are private rather than public do not engender a closely analogous invasion of privacy.  *See TransUnion*, 141 S. Ct. at 2209.

Publicity requires far more than what Hunstein has offered—it does not include just "*any* communication by the defendant to a third person."  Restatement (Second) of Torts § 652D cmt. a (emphasis added).[5]  Instead, it requires that a matter be "made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  *Id.*  Black's Law Dictionary defines "public" as "[o]f, relating to, or involving an *entire* community, state, or country" or "[o]pen or available for *all* to use, share, or enjoy"—and has defined the concept in similarly expansive language since its first edition.  *Public*, *Black's Law*

---

[5] The "publicity" required for public disclosure differs from the "publication" required for defamation.  Restatement (Second) of Torts § 652D cmt. a. Publication covers "any communication by the defendant to a third person"; it is "enough that it is communicated to a single individual other than the one defamed."  *Id.* §§ 577 cmt. b., 652D cmt. a.  "'Publicity,' on the other hand, means that the matter is made public"—a private disclosure does not suffice. *Id.* § 652D cmt. a.

Dictionary (11th ed. 2019) (emphasis added); see also Public, Black's Law Dictionary (1st ed. 1891) ("Pertaining to a state, nation, or whole community; proceeding from, relating to, or affecting the whole body of people or an entire community."). Publicity, in short, is a well-known and longstanding concept in American law.

Indeed, cases from across the federal and state judicial systems amply demonstrate the substance of publicity. See, e.g., Jenkins v. Dell Publ'g Co., 251 F.2d 447, 449 (3d Cir. 1958) (publicity in tortious invasion of privacy action assumed to exist when information was published in a newspaper circulated "where the plaintiffs lived and were known"); Virgil v. Time, Inc., 527 F.2d 1122, 1127 (9th Cir. 1975) (no publicity if information is disclosed to a nonpublic audience, unless the disclosure is accompanied by "consent to publicize"); Gilbert v. Med. Econ. Co., 665 F.2d 305, 307–09 (10th Cir. 1981) (publicity assumed when information was published in a periodical); Dortch v. Atlanta J. & Atlanta Const., 261 Ga. 350, 350–52 (1991) (publicity assumed if information is disclosed to a newspaper); Bodah v. Lakeville Motor Express, Inc., 663 N.W.2d 550, 557 (Minn. 2003) ("absent dissemination to the public at large, the claimant's private persona has not been violated" and no publicity has occurred (quotation omitted)); Shattuck-Owen v. Snowbird Corp., 16 P.3d 555, 559 (Utah 2000) (the size of an audience receiving a disclosure is not dispositive because courts must instead determine "whether the disclosure

was sufficiently public so as to support a claim for invasion of privacy" (quotation omitted)).[6]

As the Restatement explains, the distinction is between public and private communication; this is a qualitative inquiry, not a quantitative one. *See* Restatement (Second) of Torts § 652D cmt. a. To be sure, dissemination of information to many people is one way publicity can occur. But a disclosure to many people may still be private, or at least not "publicity." Although the number of people who receive information may be relevant when examining the question of publicity, it does not itself reveal whether a given disclosure qualifies as public. When a trade secret is communicated to thousands of new employees after a merger, for example, it does not become public information.[7] On the other

---

[6] A careful look at the dissenting opinion's publicity cases only proves the point that publicity is an essential element of the common-law tort of public disclosure. Dissenting Op. at 29 n.9. *Fernandez-Wells v. Beauvais*, for instance, recognized that "the extent of the required publicity to support a claim of public disclosure of private facts varies from jurisdiction to jurisdiction," but concluded that even "the most inclusive common-law definitions of 'publicity'" were not met where the plaintiff made "no allegation" that the defendant "could have expected public disclosure to arise" from his communication. 127 N.M. 487, 489–90 (Ct. App. 1999). And *Karch v. BayBank FSB* affirms that publicity is a qualitative, not a quantitative, matter. 147 N.H. 525, 535 (2002).

[7] Whether this example is best explained by the meaning of "publicity" or by privilege, as the dissent suggests, is immaterial. *See* Dissenting Op. at 35 n.12. *TransUnion* shows why. Both cases it cites describe that a privileged communication is not a "publication" in the relevant sense—that is, it is not

hand, a disclosure to a single person may very well qualify as publicity—depending on who the person is. Consider the effect of sharing another person's private information with an online personality or a reporter. The *effect* of a disclosure is what matters—not the number of people to whom it is made. That is why, rather than playing a numbers game, we ask whether the disclosed information "reaches, or is sure to reach, the public." *Id.*

Hunstein makes no allegations that suggest publicity. His complaint says that Preferred Collection placed his personal information "within the possession of an unauthorized third-party" that "populated some or all of this information into a pre-written template, printed, and mailed the letter" to Hunstein. The allegations stop there.

The dissent, in apparent agreement that these facts are insufficient on their own, indulges what it calls the "eminently reasonable inference" that "living, breathing, thinking individuals" must have read and considered the information about Hunstein's debt. Dissenting Op. at 10, 34. To further support this "inference," the dissent leans on language from Count I of the complaint, which says that Preferred Collection "disclosed information" about

---

the kind of publication that would support a defamation action. *TransUnion*, 141 S. Ct. at 2210 n.6 (citing *Chalkley v. Atlanta Coast Line R.R. Co.*, 150 Va. 301, 326–28 (1928); *Mack v. Delta Air Lines, Inc.*, 639 F. App'x 582, 586 (11th Cir. 2016) (unpublished)). The distinction the dissent draws is without a difference.

Hunstein's debt "to the employees of an unauthorized third-party mail house." *See id.* at 31. We do not see how this moves the needle. It does not say or even suggest that the employees have read and understood the information. And reading the complaint as a whole (as we must), the rest of the allegations show that the disclosure was an electronic transfer between two companies.

Indeed, Hunstein's own attorney declined to embrace the dissent's "eminently reasonable inference"—even with significant encouragement to do so. He agreed at oral argument that Hunstein had alleged that employees had "access" to his information, but not that "anyone read or perceived it." Oral Argument at 6:33–7:45. There was an obvious reason for this approach, which was also conceded at argument: the complaint was drafted to allege a pure statutory violation, one that was complete at the moment the lender hit "send" and transmitted the information to Preferred Collection. *Id.* at 4:27–4:40; 9:27–9:54. Though it is now clear (again as the lawyer conceded) that a pure statutory violation is not enough to establish harm, Hunstein never sought to replead his case. *Id.* at 7:29–7:39; 8:48–9:48.

Transmitting information that no one reads or perceives is not publicity. Contrary to the dissent's suggestion, we give Hunstein "the benefit of the doubt"; we simply decline to rewrite his complaint for him. Dissenting Op. at 37. "We will not imagine or piece together an injury sufficient to give a plaintiff standing when it has demonstrated none, and we are powerless to create

jurisdiction by embellishing a deficient allegation of injury." *Muransky*, 979 F.3d at 925 (quotations and brackets omitted).

All that to say, nowhere does Hunstein suggest that Preferred Collection's communication reached, or was sure to reach, the public. Quite the opposite—the complaint describes a disclosure that reached a single intermediary, which then passed the information back to Hunstein without sharing it more broadly.

That act cannot be said to have a "close relationship" with a tort which, at its core, requires either actual public disclosure or a substantial certainty that the disclosed information will reach the public at large. None of that is present here; again, Hunstein did not even allege that a single employee ever read or understood the information about his debt. Under even the most generous reading of his complaint, one company sent his information to another, where it was "populated" into a private letter that was sent to his own home. That is simply not enough.

Hunstein protests that Congress targeted "invasions of individual privacy" when it passed the Fair Debt Collection Practices Act. *See* 15 U.S.C. § 1692(a). We have no quarrel with him on that front. But even assuming—which we do not—that Congress was attempting to target the workaday vendor relationships alleged here, congressional intent does not automatically transform every arguable invasion of privacy into an

actionable, concrete injury.[8]   As *TransUnion* explained, courts have no "freewheeling power to hold defendants accountable for legal infractions."   *TransUnion*, 141 S. Ct. at 2205 (quotation omitted).   Because Hunstein has alleged only a legal infraction—a "bare procedural violation"—and not a concrete harm, we lack jurisdiction to consider his claim.

The dissent takes issue with our element-for-element approach.   It claims that we relegate Congress to "dutifully replicating and codifying preexisting common-law causes of action" and that our approach has no "principled line."   Dissenting Op. at 27, 14 & n.3.   Respectfully, we think that these criticisms are entirely off-base.   The dissent confuses the question of whether *this* plaintiff has alleged standing with the question of whether *any* plaintiff could allege standing.   Our standing inquiry centers on whether a given plaintiff has pleaded injury—not whether a cause of action is generally proper.   The fact that one plaintiff, Hunstein, has not pleaded injury under this statute does not show that no one else can or will.   And the dissent's approach offers *no* line, principled or otherwise; the common law analogy collapses if we can rewrite a traditional tort to exclude an essential element.

---

[8] The Supreme Court has said, for instance, that in the context of defamation, sending information to "vendors that printed and sent" mailings was not traditionally recognized "as actionable publication[]." *TransUnion*, 141 S. Ct. at 2210 n.6.

*TransUnion* illustrates both points.  To begin, that case shows how different facts can mean that some plaintiffs have standing while others do not—under the same cause of action. There, the deciding factor was whether misleading information had been published about a given person. Here, the deciding factor is whether information was publicized.  In both cases, when an element is entirely missing from the comparator tort, there is no injury.  Even so, and again in both cases, a substantive cause of action remains on the books.  And any injured party can invoke that cause of action, so long as the plaintiff pleads an actual harm that is at least analogous to one that was redressable at common law.

*TransUnion* also shows why we cannot convert the tort of public disclosure into a tort of private disclosure.  When making a comparison to the tort of defamation, it was straightforward for the Court to expand the common-law element of "false information" to the analogous category of "misleading information." Both inflict the same kind of harm for the same basic reason; they damage a plaintiff's reputation with inaccurate information.  So, under the *TransUnion* analysis, plaintiffs who suffered reputational harm because of a statutory violation could bring a lawsuit against those who committed the violation—even though it would not have qualified as defamation under the common law.

The same analogy does not hold here.  Private disclosure is not just a less extreme form of public disclosure.  Publicity causes

19-14434                Opinion of the Court                25

a qualitatively different harm, one that is essential to creating the comparator tort in the first place—having some finite number of people know (true) details about your life is fundamentally different than having that information disseminated to the general public. As the Restatement says, "it is not an invasion of the right of privacy" to "communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." Restatement (Second) of Torts § 652D cmt. a. "On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity." *Id.* The distinction, the Restatement tells us, "is one between private and public communication." *Id.* And when one is substituted for the other, the comparator tort becomes unrecognizable.[9] *TransUnion* does not allow for such "analogies."

Before we close, a few words are necessary in response to the dissenting opinion's energetic attempt to manufacture a circuit split. Dissenting Op. at 17–24. To start, six of the eight cases cited as embodying the post-*TransUnion* framework pre-date *TransUnion*. But that is really the least of the problems with the dissent's analysis. This grab-bag of cases about different alleged

---

[9] One could even say, if using the dissent's preferred terminology, that false and misleading statements are different in degree, while public and private disclosures are different in kind.

harms, different common-law analogues, and different statutory schemes offers no uniform test—much less one we have strayed from here.  And none address the problem we face: a pleading that completely fails to allege an element essential to the harm set out as a common-law comparator.

Indeed, the degree-of-harm inquiry so thoroughly endorsed in the dissent may well be a helpful explanatory tool in other cases—just not the one we have here.[10]  Because Hunstein did not allege any publicity at all, we cannot analyze the degree of that non-publicity; as we have explained, the difference between public and private is qualitative, not quantitative. The dissent, in pressing its argument, seems to have forgotten its earlier concession that finding an alleged injury in these pleadings was "on its face" in tension with *TransUnion*. *Hunstein*, 17 F.4th at 1031.  *TransUnion* provides the path we follow here.

To the extent that we need to build on that approach, it will have to wait for a case when the plaintiff actually pleads a harm that is smaller in degree rather than entirely absent.  For now, *TransUnion*'s guidance is enough.  As much as the dissent may prefer a different approach to standing doctrine, *see, e.g.*, *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1115–40 (11th Cir. 2021)

---

[10] And perhaps not in the cases cited by the dissent, either—only three of them even use the word "degree."

(Newsom, J., concurring), this decision (like *Muransky* before it) is consistent with the course the Supreme Court has set out.

★    ★    ★

One benefit of the comparison we are asked to make with common-law torts is that it allows us to better understand whether a plaintiff has suffered a real harm.  That is certainly true here.  At bottom, Hunstein is simply no worse off because Preferred Collection delegated the task of populating data into a form letter to a mail vendor; the public is not aware of his debt (at least, not because of Preferred Collection's disclosure to its vendor).  Nor is it clear, or even likely, that even a single person at the mail vendor knew about the debt or had any reason—good, bad, or otherwise—to disclose it to the public if they did.  Given the obvious differences between these facts and the traditional tort of public disclosure, we find that no concrete harm was suffered here.

"No concrete harm, no standing."  *TransUnion*, 141 S. Ct. at 2214.  Because Hunstein did not have standing, the district court lacked jurisdiction to consider his claim.  We therefore **VACATE** the district court's order and **REMAND** with instructions to dismiss the case without prejudice.

19-14434              Pryor, C.J., Concurring                    1

William Pryor, Chief Judge, joined by Tjoflat, Circuit Judge, concurring:

I join the majority opinion in full. I write separately to identify other reasons why this appeal is "an exercise in simplicity." Maj. Op. at 15. The Supreme Court expressly rejected the dissent's theory that Hunstein has standing because Preferred disclosed private information "to the vendors that printed and sent the mailings that" Hunstein received. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 n.6 (2021); Dissenting Op. at 16 n.4. And Hunstein's alleged injury bears little resemblance to the public-disclosure tort on which the dissent relies. Dissenting Op. at 28–29.

The dissent asserts that "the majority agrees (or at least doesn't disagree) that only the element of "publicity" is in dispute. *Id.* at 28; *see also id.* at 4–5. But that assertion is untrue. The three elements of the traditional invasion-of-privacy harm are absent. Hunstein's complaint fails to allege a communication in which anybody read his private information. *See TransUnion*, at 2210 & n.6 (holding that objectionable information not read "does not harm anyone"). It also fails to allege that his private information reached the public. *See* Maj. Op. at 20. And it fails to allege anything like the kind of "highly offensive" disclosures traditionally actionable at common law. *See* Restatement (Second) of Torts § 652D (Am. L. Inst. 1977). This appeal is not remotely "tricky." *Contra* Dissenting Op. at 1.

### A. The Supreme Court Expressly Rejected the Dissent's Disclosure-to-Mail-Vendor Theory.

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, controls this appeal. To determine whether Hunstein satisfies the concrete-harm requirement, we ask whether his alleged injury "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204 (internal quotation marks omitted). Hunstein must "identif[y] a close historical or common-law analogue for [his] asserted injury." *Id.*

Hunstein and the dissent identify public disclosure of private facts as a common-law analogue. Dissenting Op. at 28. That tort involves "giv[ing] publicity to a matter concerning the private life of another" that "would be highly offensive to a reasonable person" and "is not of legitimate concern to the public." RESTATEMENT (SECOND) OF TORTS, *supra*, § 652D. And the dissent asserts that the "dissemination of personal information to a [mail vendor's] employees" bears a close enough relationship to that tort. Dissenting Op. at 29.

The Supreme Court in *TransUnion* expressly rejected the dissent's theory. The Court held that "the mere existence of . . . misleading" information "in a consumer's internal credit file at TransUnion [does not] constitute[] a concrete injury." *See* 141 S. Ct. at 2209–10. The Court explained that "[p]ublication is essential to liability in a suit for defamation." *Id.* at 2209 (internal quotation marks omitted). And if "misleading information sits in a company database, the plaintiffs' harm is roughly the same, legally speaking,

19-14434            PRYOR, C.J., Concurring            3

as if someone wrote a defamatory letter and then stored it in her desk drawer." *Id.* at 2210. No publication means no concrete injury. *See id.* The plaintiffs in *TransUnion* tried to avoid that problem by deploying the same theory the dissent deploys here. They "argue[d] that TransUnion 'published' the [misleading] information internally . . . to employees within TransUnion and to the vendors that printed and sent the mailings that the [plaintiffs] received." *Id.* at 2210 n.6. But the Supreme Court declared that argument "unavailing." *Id.*

The Supreme Court adopted the defendant's argument rejecting that theory. It doubted that intra-company disclosures and disclosures to mail vendors were traditionally "actionable publications." *Id.* It added that the plaintiffs failed to prove that their private information "was actually read and not merely processed." *Id.* And its bottom-line holding could not have been clearer: the plaintiffs' "theory circumvents a fundamental requirement of an ordinary defamation claim—publication—and does not bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing." *Id.*

That holding resolves this appeal. Bare "publication" requires only that the defamatory information be read by *someone*, while "publicity" requires that the information be read by *many*. *Compare* RESTATEMENT (SECOND) OF TORTS, *supra*, § 652D cmt. a ("'Publication' . . . includes any communication by the defendant to a third person."), *with id.* ("[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning the

plaintiff's private life to a single person or even to a small group of persons."). All Hunstein alleges is that Preferred "disclosed information . . . to the employees" of the mail vendor—at best, the kind of non-actionable publication rejected in *TransUnion*. *See* 141 S. Ct. at 2210 n.6. And just as the Supreme Court rejected non-actionable "publications for the purposes of the tort of defamation," *id.*, we must reject non-actionable publications for purposes of privacy torts, *see* RESTATEMENT (SECOND) OF TORTS, *supra*, § 652D cmt. a, illus. 1 ("A, a creditor, writes a letter to the employer of B, his debtor, informing him that B owes the debt and will not pay it. This is not an invasion of B's privacy . . . ."). So, the dissent's publication-to-mail-vendor theory "circumvents a fundamental requirement of an ordinary [public-disclosure] claim . . . and does not bear a sufficiently close relationship to the traditional . . . tort to qualify for Article III standing." *See TransUnion*, 141 S. Ct. at 2210 n.6 (internal quotation marks omitted).

To be sure, the Supreme Court also held that the plaintiffs' mail-vendor theory had been forfeited, *see id.*, but its express rejection of that theory binds us as an alternative holding. The Supreme Court has made clear that when a court rejects an argument as unpreserved but then concludes that it is "[i]n any event . . . unavailing," *see id.*, the analysis that follows "[i]n any event" forms an alternative holding. *See Sochor v. Florida*, 504 U.S. 527, 534 (1992) (internal quotation marks omitted). And "alternative holdings are not dicta, but instead are as binding as

19-14434            Pryor, C.J., Concurring                  5

solitary holdings." *Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008). When the Supreme Court rejected the mail-vendor argument for Article III standing as unpreserved, it also alternatively rejected it as "unavailing." *TransUnion*, 141 S. Ct. at 2210 n.6. We are bound by that alternative rationale. *See Bravo*, 532 F.3d at 1162.

The dissent mentions only in passing that the Supreme Court "noted" that "intra-company disclosures typically aren't 'actionable publications,' at least for defamation purposes." Dissenting Op. at 35 n.12 (quoting *TransUnion*, 141 S. Ct. at 2210 n.6). That cursory reference conveniently obscures the fact that the Court rejected a theory from intra-company disclosures *and* disclosures to "the [mail] vendors that printed and sent the mailings," *see TransUnion*, 141 S. Ct. at 2210 n.6—exactly what is alleged here. And the dissent makes no effort to explain why disclosures to employee agents are relevantly different from disclosures to non-employee agents in this context. *But see* Restatement (Third) of Agency § 1.01 cmt. g (Am. L. Inst. 2006) ("The common law of agency encompasses employment as well as nonemployment relations."). In the light of the clarity with which *TransUnion* rejected the dissent's theory, it is a tad rich for the dissent to accuse the majority of "disregard[ing]," "flout[ing]," and "contraven[ing] . . . key aspects of" *TransUnion*. Dissenting Op. 1–2, 11.

*B. Hunstein's Alleged Injury Is Not Remotely Like the Public-Disclosure Tort.*

Even if the Supreme Court had not so clearly rejected the dissent's mail-vendor theory, Hunstein's claim would still fail. The public-disclosure tort on which the dissent relies is not "a close historical or common-law analogue for [Hunstein's] asserted injury." *TransUnion*, 141 S. Ct. at 2204. Hunstein's complaint lacks allegations that would support any of the three key elements that constitute the traditionally actionable invasion-of-privacy harm. The dissent's approach would supplant the Supreme Court's test with one that "leans more toward a no-match test." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 17 F.4th 1016, 1040 n.2 (11th Cir. 2021) (Tjoflat, J., dissenting) (internal quotation marks omitted), *vacated*, 17 F.4th 1103 (11th Cir. 2021). That approach is foreclosed by *TransUnion*'s holding: if an element whose presence is necessary for the plaintiff's traditionally recognized injury is absent, there is no concrete injury. *TransUnion*, 141 S. Ct. at 2209–10 (holding that there is no concrete injury if misleading information exists without the "essential" element of publication).

I divide the remaining discussion in two parts. First, I explain that Hunstein lacks a concrete injury because his complaint failed to allege that anybody read his private information. Second, I explain that the private disclosure Hunstein alleges is not one that the law traditionally recognized as highly offensive.

19-14434            Pryor, C.J., Concurring            7

1. Hunstein's Complaint Fails to Allege that Anybody Read His
Private Information.

The majority ably shows that "Hunstein makes no allegations that suggest publicity." Maj. Op. at 20. The complaint defeats any inference that Hunstein's private information reached "the public at large" or was published such that the information was "substantially certain to become . . . public knowledge." Restatement (Second) of Torts, *supra*, § 652D cmt. a. And the majority correctly explains that "Hunstein did not even allege that a single employee ever read or understood the information about his debt." Maj. Op. at 22. I write to highlight the fact that *TransUnion* makes that last point dispositive.

Hunstein failed to allege the relevant sense of communication. "Publicity" means "*communicating* [the matter] to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public *knowledge*." Restatement (Second) of Torts, *supra*, § 652D cmt. a (emphases added). And "[t]he word 'communication' is used to denote the fact that one person has brought an idea to the perception of another." Restatement of Torts § 559 cmt. a.

The lack of any allegation of communication in that sense is dispositive. The Supreme Court explained that "[t]he mere presence" of allegedly harmful information "causes no concrete harm." *TransUnion*, 141 S. Ct. at 2209–10. If the information is not perceived, "the plaintiffs' harm is roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored

it in [a] desk drawer." *Id.* at 2210. "A letter that is not sent does not harm anyone, no matter how insulting the letter is." *Id.* And the Court reiterated that point when it rejected the dissent's mail-vendor theory. *Id.* at 2210 n.6. Because perception of the information is a requirement of communication, a plaintiff must allege "that the document was actually read and not merely processed." *Id.* at 2210 n.6. If that "fundamental requirement" of the tort is absent, Hunstein's claim "does not bear a sufficiently close relationship" to the public-disclosure tort. *Id.* (internal quotation marks omitted).

Hunstein nowhere alleges that anyone at the mail vendor perceived his private information. Maj. Op. at 21–22. At oral argument, Hunstein's counsel conceded that Hunstein alleges only that employees had "access" to his information and that he did "not allege[] that anyone read or perceived it." Oral Argument at 6:30–7:42. Against Hunstein's own position, the dissent plucks one allegation out of context. *See* Dissenting Op. at 27. The complaint does indeed allege that Preferred "disclosed information . . . to the employees" of the mail vendor. So, the dissent infers that "living, breathing, thinking individuals" read the information. Dissenting Op. at 34. And the dissent cannot imagine "what other inference we *could* draw from that allegation." *Id.* The dissent's lack of imagination results from ignoring *other* allegations that explain the kind of disclosure that Hunstein alleges.

The dissent ignores specific allegations that clarify the general one it plucks out of context. The complaint alleges that

19-14434        PRYOR, C.J., Concurring        9

"Preferred disclosed to the mail house" the information and that "[t]he mail house then *populated* some or all of this information into a *pre-written* template, printed, and mailed the letter" to Hunstein. (Emphasis added.) The complaint described the nature of the "communication" and the "disclosure" as the bare electronic conveyance of information "to a third-party." "These specific allegations of what the [disclosure] consisted of govern over the general allegation that there was [disclosure]." *See SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1362 (11th Cir. 2022). The dissent fails to mention the specific allegations that defeat its inference. *But see id.* ("[T]aking the allegations of a complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations." (internal quotation marks omitted)). So Preferred did indeed disclose information to the mail vendor's agents, but the complaint describes the same automatic process that the Supreme Court explained does not constitute an injury. *See TransUnion*, 141 S. Ct. at 2210 n.6 (requiring that "the document was actually read and *not merely processed*" (emphasis added)).

*TransUnion*'s rule is simple: no communication, no concrete injury. *Id.* at 2210 & n.6. Hunstein failed to allege communication. We cannot speculate for Hunstein that someone read information that was "populated . . . into a pre-written template" to say otherwise. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 925 (11th Cir. 2020) (en banc) ("[W]e are

powerless to create jurisdiction by embellishing a deficient allegation of injury." (internal quotation marks omitted)). It follows that the complaint fails to allege a concrete injury.

### 2. Hunstein's Complaint Fails to Allege a Highly Offensive Disclosure.

The bare communication of private information to another is not "a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204 (internal quotation marks omitted). Taking personal offense has long been insufficient to constitute a legal injury. *See id.* at 2210. For example, communicating defamatory information *to the plaintiff alone* was not actionable in tort. *See* THEODORE F. T. PLUCKNETT, A CONCISE HISTORY OF THE COMMON LAW 496 (5th ed. 1956) (explaining that "[p]ublication to a third party was clearly necessary, *for in no other way could damage result*" (emphasis added)). Moreover, "[t]he law is not for the protection of the hypersensitive, and all of us must, to some reasonable extent, lead lives exposed to the public gaze." W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 117, at 856 (5th ed. 1984). For that reason, the public-disclosure tort requires that the publicity given to private information be "of a kind *highly* offensive to the ordinary reasonable man." RESTATEMENT (SECOND) OF TORTS, *supra*, § 652D cmt. c (emphasis added).

Consistent with that history, personal offense alone is not a concrete injury. *See TransUnion*, 141 S. Ct. at 2209–10. "[T]he Supreme Court has long rejected allegations of offense, fear, and

stigma as sufficient to establish standing." *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1337 (11th Cir. 2020) (Newsom, J., concurring). Some asserted injuries are "too trivial to cause harm," *Strubel v. Comenity Bank*, 842 F.3d 181, 190 (2d Cir. 2016) (internal quotation marks omitted), such as "the dissemination of an incorrect zip code," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1550 (2016). Because mere insult was traditionally insufficient in tort, the Supreme Court has held that taking personal offense to being labeled a potential terrorist is not enough unless that misleading information is communicated to someone else. *See TransUnion*, 141 S. Ct. at 2209–10. So, if Hunstein fails to allege conduct that is offensive because it tends to cause a traditionally actionable harm, his asserted injury is not concrete.

Although a plaintiff need not satisfy all common-law elements precisely, Hunstein fails to allege anything *remotely* like the kind of offensive conduct for which the law traditionally provided a remedy. *Contra* Dissenting Op. at 28 ("the majority agrees (or at least doesn't disagree) that Hunstein's allegations satisfy the highly-offensive . . . element[].")。 The complaint alleges that "Preferred disclosed to the mail house" Hunstein's "son's name" and the fact that Hunstein owed $2,449.23 for "his son's medical treatment." Hunstein is not suing on behalf of his son, so he lacks standing to complain about the publication of his son's name and his status as a patient. *See Spokeo*, 136 S. Ct. at 1548 (explaining that, "[f]or an injury to be particularized, it must affect the plaintiff in a personal and individual way" such that he

"personally has suffered some actual or threatened injury" (internal quotation marks omitted)). But even setting that obstacle to the side, the collection notice that Hunstein attached to his complaint contains no information about "a person's medical condition." *See Wolfe v. Schaefer*, 619 F.3d 782, 784 (7th Cir. 2010); *contra* Dissenting Op. at 35 n.12. And it contains little personal information: it identifies only the patient's name, the debtor's name, and the amount due.

Publishing that kind of information to another has never been "a harm traditionally recognized as providing a basis for a lawsuit." *See TransUnion*, 141 S. Ct. at 2204 (internal quotation marks omitted). Telling a third person another's name is not the kind of offense for which the law has ever provided a remedy. It is hard to see how being labeled a "patient" constitutes a concrete injury. If a person walks out of a doctor's office, passersby could infer that he is a patient. If a passerby then tells another that he saw the person walk out of the doctor's office, did the person suffer a concrete injury? *Cf. Davis v. Gen. Fin. & Thrift Corp.*, 57 S.E.2d 225, 227 (Ga. Ct. App. 1950) (explaining that "the protection afforded by the law to the right of privacy must be restricted to ordinary sensibilities and not to supersensitiveness or agoraphobia" and that "[t]here are some shocks, inconveniences and annoyances which members of society in the nature of things must absorb without the right of redress" (internal quotation marks omitted)). Hunstein might find that label offensive or insulting. *But see* RESTATEMENT (SECOND) OF TORTS § 652D cmt. c ("[M]inor and

moderate annoyance, as for example through public disclosure of the fact that the plaintiff has clumsily fallen downstairs and broken his ankle, is not sufficient . . . ."). But more is needed to allege a concrete injury. See TransUnion, 141 S. Ct. at 2209–10.

The same is true of identifying the debtor and his debt to make a reasonable effort to collect. "Many American courts did not traditionally recognize," id. at 2210 n.6, that reasonable debt-collection efforts were within the harms for which the law provided a remedy. E.g., Housh v. Peth, 133 N.E.2d 340, 344 (Ohio 1956) (explaining that the "law in nowise prevents a creditor from making a reasonable effort to collect a debt"). For that reason, the law did not regard as a harmful invasion of privacy the publication of debt-related information to the debtor's employer. RESTATEMENT (SECOND) OF TORTS § 652D cmt. a, illus. 1 ("A, a creditor, writes a letter to the employer of B, his debtor, informing him that B owes the debt and will not pay it. This is not an invasion of B's privacy . . . ." (emphasis added)). Likewise for publishing debt-related information to the employees of a telegraph company. See, e.g., Davis, 57 S.E.2d at 227 ("[A] publication to a few employees of a telegraph company who are not alleged to be acquainted with the alleged injured party would not offend the sensibilities of a person who has gone into debt and subjected himself to the standard communications of a civilized society."). Because Hunstein fails to allege offensive conduct that "cause[s] the sort of reputational harm remediated at the common law," Maj. Op. at 4, his theory "does not bear a sufficiently close

relationship to the traditional . . . tort," see *TransUnion*, 141 S. Ct. at 2210 n.6 (internal quotation marks omitted).

To be sure, "Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *See id.* at 2204–05 (internal quotation marks omitted). Congress could, for example, make actionable a publication that is offensive because of its tendency to cause reputational harm even though the common law did not make that publication actionable. *See id.* at 2209–10. And Congress need not condition providing a remedy for reputational harm on the degree of offensiveness the common law required.

But personal offense, by itself, is not a *de facto* injury. And Hunstein's allegation that Preferred injured him by disclosing to a mail house that he has a medical bill constitutes mere personal offense; that conduct bears no relationship to traditionally recognized harms. For that reason, Hunstein failed to allege anything "remotely harmful." *See id.* at 2204–05 (internal quotation marks omitted).

Make no mistake—this appeal is an exercise in simplicity in more ways than one. *TransUnion* expressly rejected the dissent's publication-to-mail-vendor theory. *Id.* The dissent obscures that fact by asserting that the majority adopts a perfect-match test. *See* Dissenting Op. at 13, 27-28. Not true. We apply *TransUnion*'s simple rule that an element must be present if that element is necessary for the presence of the *harm* that was traditionally actionable. *See TransUnion*, 141 S. Ct. at 2209–10 (holding that

19-14434                PRYOR, C.J., Concurring                15

publication is necessary for there to be a concrete injury but that falsity is not because publication of misleading information can also cause the same kind of significant reputational harm traditionally actionable as defamation); Maj. Op. 3, 13–14, 17. Hunstein fails to allege that anyone read his private information, that it reached the public, or that the disclosure caused anything more than personal offense. Supreme Court precedent requires us to reject the dissent's "no-match" test. *Hunstein*, 17 F.4th at 1040 n.2 (Tjoflat, J., dissenting) (internal quotation marks omitted).

19-14434                 Newsom, J., Dissenting                 1

NEWSOM, Circuit Judge, joined by JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges, dissenting:

The majority insists that deciding this case is "an exercise in simplicity." Maj. Op. at 15. Boy, I disagree—I think it's actually (to use another of the majority's terms) pretty "tricky." *Id.* at 2. And to be honest, I think the majority has made the case "simpl[e]" only by whistling past its complexities and decreeing a conclusion rather than grappling with the subtleties of the standing issue that it presents. Today's majority faults the now-vacated panel opinion for the "energy" that it expended in its standing analysis. *Id.* at 6. The majority, it seems to me, expends far too little.

Boiled to its essence, the majority's analysis proceeds as follows: (1) Richard Hunstein alleged nothing more than that a debt-collector, Preferred Collections & Management Services, Inc., disclosed his private information to a third-party mail vendor, CompuMail Information Services, Inc.; (2) the common-law comparator under which Hunstein is traveling in his effort to establish Article III standing—the sub-species of the invasion-of-privacy tort known as "public disclosure of private facts"—requires, as one of its "essential" elements, that the defendant have "give[n] publicity to a matter concerning the private life" of the plaintiff; (3) because Preferred's disclosure of Hunstein's information was insufficiently *public* to satisfy that tort's "publicity" element, the common-law analogy—and with it, Hunstein's standing—fails.

2                    Newsom, J., Dissenting                    19-14434

The majority's conclusion is the product of several interrelated errors.  First, and perhaps most ironically, the majority's analysis disregards—and ultimately contravenes—key aspects of the very decisions on which it purports to principally rely, *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), and *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).  Second, the majority studiously ignores the analytical framework that both parties and at least seven other circuits agree should govern the standing inquiry in the wake of *Spokeo* and *TransUnion*.  (Nor, tellingly, does the majority offer any meaningful alternative.)  And finally, when the rubber meets the road, the majority misstates the explicit allegations of Hunstein's complaint in favor of its own anodyne paraphrase.

For these reasons, and because under the proper—and heretofore agreed-upon—analysis, Hunstein has alleged sufficient facts to support Article III standing at the motion-to-dismiss stage, I respectfully dissent.

I

Before jumping into my critique, a bit of table-setting.  *First*, let me briefly recap the essential facts:  Richard Hunstein incurred a debt to Johns Hopkins All Children's Hospital arising out of his minor son's medical treatment.  The hospital assigned the debt to Preferred Collections & Management Services, Inc. for collection.  Preferred in turn hired CompuMail Information Services, Inc., a California-based commercial mail vendor, to handle the collection.  Preferred electronically transmitted to CompuMail—and, in

19-14434                Newsom, J., Dissenting                3

particular, the complaint says, to CompuMail's "employees"—
"sensitive medical information" about Hunstein, including not
only (1) his status as a debtor and (2) the exact balance of his debt
and the entity to which it was owed, but also (3) that the debt
concerned his son's medical treatment and (4) his son's name.
CompuMail used that information to generate and send a dunning
letter to Hunstein.

Hunstein filed a complaint, asserting, as relevant here, that
"when it disclosed information about [his] purported . . . debt to
the employees of an unauthorized third-party mail house," Pl.'s
Compl. at 5, Preferred violated a provision of the Fair Debt
Collection Practices Act that generally prohibits debt collectors
from communicating consumers' personal information to third
parties "in connection with the collection of any debt," 15 U.S.C.
§ 1692c(b).   The district court dismissed Hunstein's action for
failure to state a claim.  Hunstein appealed, and a three-judge panel
on which I served requested supplemental briefing on the
threshold question whether he had Article III standing to sue.  The
panel twice concluded that he did—both initially, before the
Supreme Court issued its decision in *TransUnion*, and then again
thereafter, in an amended opinion and over a dissent—and
reversed the district court's dismissal. *See Hunstein v. Preferred
Collection & Mgmt. Servs., Inc.*, 17 F.4th 1016, 1024 (11th Cir.
2021).   The en banc court then vacated the panel's opinion to
reconsider Hunstein's standing. *See* 17 F.4th 1103 (11th Cir. 2021).

4                    Newsom, J., Dissenting                 19-14434

*Second*, let me narrow the scope of the dispute. There are, happily, more than a few things on which the majority and I agree:

1.    We agree, for instance, that pleading "[a] 'bare statutory violation' is not enough," in and of itself, to establish a "concrete" injury for Article III standing purposes. Maj. Op. at 10 (quoting *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 936 (11th Cir. 2020) (en banc)). So the mere fact that Hunstein alleges that Preferred violated the FDCPA when it disclosed his private information to CompuMail's employees does not alone suffice.

2.    We agree that in determining the concreteness of a plaintiff's injury resulting from a statutory violation, the Supreme Court has instructed us to focus on whether that injury has a "close relationship" to "a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." Maj. Op. at 11 (quoting *TransUnion*, 141 S. Ct. at 2204).

3.    We also agree that when comparing a statutory harm to a common-law analogue for the purpose of conducting the "close relationship" analysis, the Court has further instructed us not to require an "exact duplicate." Maj. Op. at 8 (quoting *TransUnion*, 141 S. Ct. at 2209). Instead, as the majority here rightly recognizes, we should ask only whether the alleged statutory harm is "close enough" to a common-law comparator. *Id.* at 13.

4.    We agree that in this particular case the applicable common-law comparator is the tort known as "public disclosure of

19-14434                Newsom, J., Dissenting                        5

private facts." Maj. Op. at 4; *see also TransUnion*, 141 S. Ct. at 2204 (recognizing "disclosure of private information" as a valid Article III analogue).

5.    Finally, the majority and I seem to agree (or at least not to disagree) that Hunstein's allegations satisfy two of that tort's three elements—namely, that Preferred's disclosure of what he calls "sensitive medical information" concerning his young son's treatment "(a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D (1977); *see also* Maj. Op. at 16–17 & n.5 (acknowledging those elements only "for information's sake").[1]

The majority identifies a single—and in its view, fatal—"problem" with Hunstein's theory of standing: The harm that he alleges, it says, "lacks a necessary element of the comparator tort—

---

[1] All the majority can bring itself to say about the offense and public-concern elements, without any explanation whatsoever, is that they are—or might be?—"up for debate." Maj. Op. at 16 n.4 (citing *Hunstein*, 17 F.4th at 1041–44 (Tjoflat, J., dissenting). Because the majority doesn't "go further," *id.*, I won't either, except to point readers to the panel's fairly detailed investigation of those two elements. For its part, the concurring opinion confidently asserts that all "three elements . . . are absent" from Hunstein's case, Pryor Concurring Op. at 1, only to omit any discussion of the public-concern element, *see generally id.* On the question whether the disclosure of Hunstein's private medical-related information here was, for Article III purposes, close enough to the kind of disclosure that would be "highly offensive" to the ordinary person, we'll just have to agree to disagree. *Compare Hunstein*, 17 F.4th at 1029 n.8, *with* Pryor Concurring Op. at 9–14.

the requirement that the disclosure be *public*." Maj. Op. at 3; *see also* Restatement (Second) of Torts § 652D ("One who gives *publicity* to a matter concerning the private life of another is subject to liability . . . ." (emphasis added)). "[W]ithout publicity," the majority continues, "a disclosure cannot possibly cause the sort of reputational harm remediated at the common law." Maj. Op. at 4. And because "the elements do not match up," the majority holds, Hunstein can't demonstrate Article III standing. *Id.* at 3.

The dispute here, therefore, centers on one element of a three-element tort—and, in particular, on whether Hunstein's allegations concerning that tort's "publicity" element, though not an "exact duplicate," are "close enough" for Article III purposes. The majority and I disagree about how close is "close enough," about how the "close enough" question should be evaluated, and ultimately, about whether Hunstein's publicity-related allegations satisfy the "close enough" standard. That disagreement is narrow, but it is profound.

## II

As I've said, the majority's conclusion here—that Hunstein lacks Article III standing because he hasn't alleged a sufficiently "public" disclosure of his private information—rests on three interrelated errors. First, the majority disregards key aspects of the Supreme Court's decisions in *Spokeo* and, even more so, *TransUnion*. Second, the majority ignores an entire corpus of circuit-level precedent that has grown up in the wake of *Spokeo* and *TransUnion* as a means of evaluating whether a plaintiff's

19-14434                Newsom, J., Dissenting                7

statutory-harm allegations bear a "close relationship" to a common-law analogue. And finally, as a capper, the majority whitewashes the explicit allegations of Hunstein's complaint.

Let me explain.

## A

The majority leans heavily on the Supreme Court's decisions in *Spokeo* and, especially, *TransUnion*, invoking the former almost 20 times, the latter more than 40. To be sure, *TransUnion*, in particular, looms large here, and warrants a close look—closer, I fear, than the majority gives it. As I will explain, although the majority insists that *TransUnion* supports (even requires) its conclusion, it conspicuously disregards features of that decision that, in fact, fatally undermine its position.

In *TransUnion*, a credit-reporting agency compiled personal and financial information about individual consumers, created reports, and then sold those reports to third parties. *See* 141 S. Ct. at 2201. TransUnion, the agency, introduced an add-on product, OFAC Name Screen Alert, which compared an individual consumer's name against a list of individuals deemed a threat to national security by the Treasury Department's Office of Foreign Assets Control and placed an alert on the credit report of any consumer whose name was a potential match. *See id.* A class of consumers with OFAC alerts on their accounts sued TransUnion under the Fair Credit Reporting Act, which they alleged it had violated by failing to use reasonable procedures to assure the

"maximum possible accuracy" of their credit files. *See id.* at 2202. As relevant here, the question for the Supreme Court was whether the alleged statutory violations constituted Article-III-qualifying concrete injuries.

Echoing its earlier decision in *Spokeo*, the Court in *TransUnion* emphasized that in determining concreteness, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204 (quoting *Spokeo*, 578 U.S. at 341). "That inquiry," the Court continued, "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* And while the Court firmly rejected any suggestion that "federal courts [may] loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard," it also cautioned that *Spokeo*'s focus on "close" common-law analogues "does *not* require an exact duplicate in American history and tradition." *Id.* (emphasis added); *accord, e.g., Muransky*, 979 F.3d at 926 (noting that the "fit between a new statute and a pedigreed common-law cause of action need not be perfect").

The answer to the "close relationship" question in the case before it, the *TransUnion* Court held, depended on the particular class members' allegations. Those who presented evidence that their credit reports had been disseminated to third parties established a concrete injury bearing the requisite relationship to the common-law tort of defamation, and thus concrete injury. *See*

141 S. Ct. at 2208–13. Conversely, those whose credit reports had not been provided to third parties did not. *See id.* In the Court's words, the latter group of plaintiffs suffered no concrete harm because the inaccurate information "s[at] in [TransUnion's internal] database" and was never "disclosed to a third party." *Id.* at 2210.

The majority's *TransUnion*-related errors are twofold. First, the majority oversimplifies and overplays the aspects of *TransUnion* that it likes, ignoring critical distinctions between that case and this one. Second, and worse, the majority disregards the aspects of the decision that it doesn't like and that, properly understood, subvert its analysis and conclusion. I'll take those errors in turn.

1

The majority takes the *TransUnion* Court's denial of standing to the plaintiffs whose reports hadn't been disclosed to third parties to dictate the outcome of this case. *See* Maj. Op. at 14. But *TransUnion*'s holding to that effect is distinguishable in two significant respects.

First, it arose in a dramatically different procedural posture. The case in *TransUnion* proceeded beyond the pleadings and summary judgment and went all the way to a jury; accordingly, the Supreme Court required that "the specific facts set forth by the plaintiff to support standing . . . be supported adequately by the evidence adduced at trial." 141 S. Ct. at 2208 (quoting *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Hunstein's case, by contrast, never got past the motion-to-dismiss stage, at which, of course, we must accept the facts alleged in his complaint as true and draw all reasonable inferences in his favor. *See, e.g., K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1043 (11th Cir. 2019). We thus have no "evidence" by which to evaluate whether, in the majority's words, anyone at CompuMail "ever read or understood the information about [Hunstein's] debt." Maj. Op. at 22; *see also TransUnion*, 141 S. Ct. at 2210 n.6 (faulting the plaintiffs there for failing to adduce "evidence" that their information "was actually read and not merely processed"). What we do have, it seems to me, are (1) Hunstein's explicit allegation that Preferred "disclosed" his son's "sensitive medical information" to CompuMail's "employees," and (2) the eminently reasonable inference that the flesh-and-blood individuals to whom that information was disclosed read it. (I'll have much more to say below about the significance of Hunstein's "employees" allegation—and the majority's refusal to meaningfully engage it. *See infra* at 25–31.)

Second, the plaintiffs in *TransUnion* to whom the Supreme Court denied standing had utterly and completely failed—even following a full-blown trial—to produce *any* evidence of *any* disclosure of *any* sort. As the majority here accurately summarizes the facts of *TransUnion*, the OFAC alerts about which those plaintiffs complained "had not been shared with any creditors." Maj. Op. at 13. Rather, the alerts had remained safely tucked away "in [the plaintiffs'] internal credit file[s]" at the credit-reporting

19-14434          Newsom, J., Dissenting          11

agency, 141 S. Ct. at 2209, and were thus "kept private," Maj. Op. at 14. Accordingly, not only had the plaintiffs there failed to demonstrate "publication"—an element of the defamation claim they sought to use as a comparator—they had failed to demonstrate *anything like it*. That's not true here. Hunstein alleged a disclosure to a third party and its employees—the majority just thinks that disclosure was insufficiently "public." For reasons I'll explain, while Hunstein might not have alleged that Preferred disseminated his private information broadly enough to satisfy the public-disclosure tort's "publicity" element *if he were seeking to prove that claim on the merits*, he most certainly alleged a dissemination that, on a proper understanding, was "close enough" to satisfy Article III.

**2**

Not only does the majority paper over key distinctions between *TransUnion* and this case, it actually flouts *TransUnion* in two important respects—one general and the other quite specific.

As a general matter, the majority fundamentally misunderstands the "close relationship" standard that the *TransUnion* Court reiterated. Although it dutifully recites the Supreme Court's reassurance that an intangible-injury plaintiff needn't "exact[ly] duplicate" a common-law cause of action to demonstrate Article III standing, the majority nonetheless insists that all "element[s] 'essential to liability' under the comparator tort" must be present. Maj. Op. at 8 (quoting *TransUnion*, 141 S. Ct. at 2209); *see also, e.g., id.* at 3 (noting that "the elements [must]

match up"). I fail to understand—and the majority never explains—how its jot-for-jot, element-for-element requirement isn't just a dressed-up version of the very "exact duplicate" standard that the Supreme Court has flatly disavowed. After all, if the majority is going to require a plaintiff like Hunstein to satisfy every element of a common-law claim—without any accommodation at all—how *isn't* it, in practice, requiring an "exact duplicate"? Under what circumstances could a plaintiff meet every element of a common-law cause of action *without* having "exact[ly] duplicate[d]" the common-law claim? So far as I can tell, that's an empty set.

To be clear, it's no answer to say—as the majority vaguely suggests—that its element-for-element requirement complies with the Supreme Court's "exact duplicate" prohibition because it applies only to those elements that are "essential to liability." Maj. Op. at 8 (quoting *TransUnion*, 141 S. Ct. at 2209); *see also, e.g., id.* at 15 (holding that a plaintiff must allege every "element essential to" its "historical comparator"); *id.* at 19 n.6 ("essential element"); *id.* at 23 ("essential element"); *id.* at 25 ("essential"); *id.* at 26 ("essential"). What elements of a common-law claim *aren't* "essential to liability"? Isn't essentiality what makes an "element" an element? *Black's* confirms what we already know: An "element" is "[a] constituent part of a claim that *must be proved for the claim to succeed*." *Element*, Black's Law Dictionary (11th

19-14434              Newsom, J., Dissenting              13

ed. 2019) (emphasis added).² I see no way around the conclusion that the majority's rigid element-for-element standard effectively reimposes the very "exact duplicate" test that the *TransUnion* Court expressly renounced.

To be clear, though, the majority's decision doesn't just contravene *TransUnion*'s language, it contravenes *TransUnion*'s *holding*. The credit-reporting agency in *TransUnion* argued that even those plaintiffs whose reports *were* disclosed to third parties didn't suffer a harm with a sufficiently "close relationship" to the common-law tort of defamation because, it said, the OFAC alerts on the disseminated credit reports were only "misleading"—not "literally false," as proof of defamation requires. *See* 141 S. Ct. at 2209 (citing Restatement (Second) of Torts § 558); *see also Defamation*, Black's Law Dictionary (defining "defamation" to require "a false statement"). The Supreme Court rejected the agency's perfect-match contention, emphasizing—again—that "[i]n looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts, we do not require an exact duplicate." *TransUnion*, 141 S. Ct. at 2209; *see also id.* at 2204 ("*Spokeo* does not require an exact duplicate in American history

---

² Think about it this way: Among (1) duty, (2) breach, (3) causation, and (4) damages, which isn't "essential" to a tort plaintiff's negligence claim? Can a fraud plaintiff fail to show either (1) a false statement, (2) materiality, (3) reasonable reliance, (4) causation, or (5) damages and yet still expect to recover?

14                  Newsom, J., Dissenting                19-14434

and tradition."). Despite the absence of *any* proof of actual falsity—an element all accepted as essential to a successful defamation claim—the Court found that the plaintiffs whose reports had been disseminated had Article III standing. *Id.* at 2209.

The majority acknowledges, as it must, that the Court in *TransUnion* held that "for purposes of comparing the class members' alleged harms to defamation . . . *misleading* information was close enough, element-wise, to *false* information." Maj. Op. at 13 (emphasis added); *see also id.* at 14 (noting the *TransUnion* Court's conclusion that "misleading information—like false information—can lead to unfair reputational harm if publicized"). Conspicuously, though, the majority never convincingly explains why the showing of *near* falsity in *TransUnion* (*i.e.*, misleadingness) *was* "close enough" to support standing by analogy to a defamation claim, and yet the allegation of *near* publicity here (*i.e.*, dissemination to an as-yet-unknown number of employees) *is not* "close enough" to support standing by analogy to a public-disclosure-of-private-facts claim. I fail to see a principled line between those two, and the majority certainly never successfully articulates one.[3]

---

[3] The majority takes two whacks at it, neither of which persuades me. First, it repeatedly says that, in this case, Hunstein is "completely missing" an element of his common-law analogue. Maj. Op. at 15; *see also, e.g., id.* at 24 ("entirely missing"). But of course, in exactly the same way, the relevant plaintiffs in *TransUnion* were "completely missing" the key element of falsity, and yet the Supreme Court sanctioned their standing. And in any event, the

19-14434                Newsom, J., Dissenting                15

★   ★   ★

In sum, then, the majority overreads *TransUnion*'s denial of standing to a subset of the claimants there at the expense of defying its mandate that courts shouldn't require plaintiffs to "exact[ly] duplicate" common-law causes of action. The majority thus purports to follow *TransUnion*, but ends up spurning it. As I'll explain next, by insisting on a rigid, anti-*TransUnion* element-for-element test, the majority departs from the heretofore unanimous view among the circuits about how to implement the "close

---

majority's assertion here that publicity is "completely missing" from Hunstein's case is just that—an assertion. Quoting the *Restatement*, the majority says, for instance, that only a communication of private information to "a large number of persons" will suffice for public-disclosure purposes; dissemination to "a single person or even to a small group of persons" won't cut it. *Id.* at 25 (quoting Restatement (Second) of Torts § 652D cmt. a). True enough, but—and I'll have more to say about this shortly—from where is the majority drawing its critical "single person or . . . small group" premise? Certainly, as I'll explain, *not* from Hunstein's complaint. *See infra* at 29–35.

Second, and relatedly, the majority decrees—just announces, as if it were a principle of the natural law—that disclosure of one's information to a "small group" is "not just a less extreme form" of more widespread dissemination, but, rather, is "fundamentally different" and thus gives rise to a "qualitatively different harm." Maj. Op. at 25. Respectfully, all the majority offers in support of that conclusion is its own say so—just words. It seems to me self-evident that a disclosure to a small group (again, even if that's all we're dealing with here) is *precisely* a "less extreme form" of a disclosure to a larger group. The majority's insistence on a neat, clean, and bright line between "small" and "large"—and thus, it says, between "private" and "public"—blinks reality.

16                     Newsom, J., Dissenting                     19-14434

relationship" standard.   And in doing so, the majority denies
Congress *any* breathing space in which to recognize judicially
enforceable rights that didn't exist at common law.[4]

_____

[4] Before moving on, a brief response to the concurring opinion, which
confidently states (and restates and restates) that "[t]he Supreme Court in
*TransUnion* expressly rejected" my standing "theory" when it observed in a
footnote that the plaintiffs there had abandoned an alternative argument.
Pryor Concurring Op. at 2; *see TransUnion*, 141 S. Ct. at 2210 n.6.
Respectfully, I think my concurring colleague is overplaying his hand.   The
Supreme Court didn't "expressly" (or "clearly") do much of anything relevant
to this appeal in that footnote, Pryor Concurring Op.  at 1, 2, 5, 14, let alone
anticipatorily reject my "theory."   Before saying anything of substance about
the "new argument" that the plaintiffs there were pressing "[f]or the first time"
before it, the *TransUnion* Court held that the argument was "forfeited."
*TransUnion*, 141 S. Ct. at 2210 n.6.  It then went on to observe—in what the
now-vacated panel opinion explained was dictum, *see Hunstein*, 17 F.4th at
1031—that the plaintiffs' argument was "unavailing" for two reasons, both of
which caution against overreading the footnote.  First, the Court tentatively
observed that "disclosures to printing vendors" at common law weren't
"*necessarily* . . . actionable publications."  *TransUnion*, 141 S. Ct. at 2210 n.6
(emphasis added).   Today's concurrence conspicuously omits the limiting
adverb from its multiple restatements of the Supreme Court's language.
Second, the *TransUnion* Court emphasized that the plaintiffs there, who had
the benefit of a full trial, had failed to adduce any "evidence" that the
information about which they were complaining "was actually read and not
merely processed."  *Id.*  Here, of course, because Hunstein was thrown out at
the pleadings stage, he never had the opportunity to develop evidence to
support his allegations.

Needless to say, if I thought the Supreme Court's diffident language—
which was buried in footnoted dictum about a forfeited issue, appeared in a
case in a materially different procedural posture, and addressed a different
common-law analogue—"expressly" rejected the theory of standing that I've

## B

On any reading, *TransUnion* makes two things absolutely clear: On the one hand, Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." 141 S. Ct. at 2205 (quotation omitted). Accordingly, the Court reiterated its earlier rejection of "the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Id.* (quoting *Spokeo*, 578 U.S. at 341).[5] On the other hand—as just explained—the Court reaffirmed that Congress has *some* role in recognizing new judicially enforceable rights; it is not limited to replicating and codifying preexisting

---

put forward here, I would happily stand down. But I just don't think it did. To the contrary, for reasons I've explained in text, *TransUnion*'s above-the-line discussion, and holding, reaffirm my view that Hunstein's allegations are sufficient to confer Article III standing.

[5] To be clear, I freely admit as much, *see supra* at 3–4, and the majority surely understands that. For that reason, its parting shot—that I'm seeking to use this dissent to plug my "different approach to standing doctrine," Maj. Op. at 26 (citing *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1115–40 (11th Cir. 2021) (Newsom, J., concurring))—rings hollow. I've been very candid about the problems that I think plague current standing jurisprudence, *see also Laufer v. Arpan LLC*, 29 F.4th 1268, 1283–97 (11th Cir. 2022) (Newsom, J., concurring), but for present purposes I'm content to take *Spokeo* and *TransUnion* exactly as I find them. The problem for the majority, explained in text, is that neither *Spokeo* nor *TransUnion* supports its wooden element-for-element test.

18                   Newsom, J., Dissenting                   19-14434

common-law causes of action.  As the *TransUnion* Court said, a statutory-harm plaintiff needn't provide an "exact duplicate" of a common-law claim—a "close" analogue is enough.  *Id.* at 2204 (quoting *Spokeo*, 578 U.S. at 341).

The challenge, of course, is that discerning whether the required "close relationship" exists between a modern statutory claim and a traditional common-law cause of action isn't always (or even usually) obvious.  It isn't, to use the majority's term, "simpl[e]." *See Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1121 (11th Cir. 2021) (Newsom, J., concurring) ("Just how closely analogous to a common-law tort must an alleged injury be in order to be 'concrete'?").  In neither *Spokeo* nor *TransUnion* did the Supreme Court purport to answer all of the questions; rather, the Court left it to the lower courts to operationalize the "close relationship" standard.

And operationalize it they did.  Steering the required middle course between the two fixed points—again, (1) that Congress can't enact just any old injury into existence, and (2) that plaintiffs suing under congressional enactments needn't "exact[ly] duplicate" an existing common-law claim—the circuits developed what I'll call a "kind-degree" framework:  A plaintiff suing on a statutory cause of action must show that his alleged injury is similar in *kind* to the harm addressed by a common-law cause of action, but not that it is identical in *degree*.  This consensus approach makes good sense.  The kind-degree framework not only abides by the Supreme Court's dual directives, but also tethers modern

plaintiffs to historical antecedents without hamstringing Congress's ability to innovate.

The now-vacated panel opinion detailed the evolution and adoption of the kind-degree framework in the courts of appeals, adopted that framework as its own, and then applied it to decide Hunstein's case. *See Hunstein,* 17 F.4th at 1024 (citing *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th Cir. 2017); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 463 (7th Cir. 2020); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021); *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 691 (8th Cir. 2017); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 639 (3d Cir. 2017); and *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021)). Wholly unsurprisingly, in their briefs to the en banc court, both Preferred and Hunstein framed their arguments by reference to the kind-degree framework, agreeing that it supplies the proper inquiry. *See* En Banc Br. of Appellee at 18 ("[T]he intangible statutory harm must still be the same *kind* of harm actionable at common law." (emphasis in original)); *id.* at 42 ("[I]t is necessary to determine whether the statutory harm is the same *kind* of harm actionable at common law." (emphasis in original)); *id.* at 43 ("That is a question of kind, not degree."); En Banc Br. of Appellant at 4 ("An important nuance in analyzing the 'close relationship' is whether a cause of action is similar in kind, but not necessarily in degree.").

Quite surprisingly, to me anyway, the majority just waves away all of this—the circuit-court decisions adopting the kind-

degree framework, the parties' discussions of it, its application to this case, all of it. The majority neither accepts nor rejects the kind-degree framework—because it can't bring itself to engage it. Given the majority's conspicuous avoidance, and its equally conspicuous failure to offer any alternative methodology for deciding the knotty "close enough" questions that inevitably arise in the wake of *Spokeo* and *TransUnion*, it's worth surveying the landscape once again.

I begin at the beginning, with Judge O'Scannlain's opinion for the Ninth Circuit on remand from the Supreme Court in *Spokeo*. Importantly for our purposes, he explained there that *Spokeo*'s "close relationship" test requires only that an intangible harm be "closely similar *in kind* to others that have traditionally served as the basis for [a] lawsuit." *Robins*, 867 F.3d at 1115 (emphasis added). Tellingly, the Ninth Circuit held that even though an FCRA claim differed in key respects from the common-law torts of defamation and libel—both of which, for instance, "required the disclosure of false information that would be harmful to one's reputation"—the plaintiff's statutory cause of action bore a sufficiently "close relationship" for Article III purposes. *Id.* (emphasis omitted).

Now-Justice Barrett's opinion for the Seventh Circuit in *Gadelhak*—which, notably, the Supreme Court cited with approval in *TransUnion*—is similar, if even more explicit. In holding there that a plaintiff's allegation that he had received several unwanted text messages in violation of the Telephone

19-14434            Newsom, J., Dissenting            21

Consumer Protection Act constituted an Article-III-qualifying concrete injury, the court emphasized—as had Judge O'Scannlain—that "when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a 'close relationship' in *kind, not degree*." 950 F.3d at 462 (emphasis added). In particular, the Seventh Circuit held that the harm resulting from the unwelcome text messages bore a sufficient relationship to the tort of intrusion upon seclusion, even though the court recognized that "[a] few unwanted automated text messages may be too minor an annoyance to be actionable at common law." *Id.* at 463. The key point, the court emphasized, was that "such texts nevertheless pose the same *kind* of harm that common law courts recognize." *Id.*[6]

Other courts decided post-*Spokeo* standing cases in the same basic manner. For instance, in an opinion authored by Judge Wilkinson, the Fourth Circuit held that a class of plaintiffs who had received two phone calls within a year in violation of the TCPA had Article III standing. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 652–53 (4th Cir. 2019). The court acknowledged that the plaintiffs might not have alleged a harm that would "rise[] to a level that would support a common law cause of action." *Id.* at 653–54.

---

[6] Significantly, the Seventh Circuit has reaffirmed the kind-degree framework post-*TransUnion*. *See, e.g.*, *Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021) ("*Spokeo* and [*TransUnion v.*] *Ramirez* make clear our responsibility to look for a close relationship 'in kind, not degree.'" (quoting *Gadelhak*, 950 F.3d at 462)).

Importantly, though, the court—in an analysis utterly irreconcilable with today's majority's exacting approach—rejected the defendants' request to "import the elements of common law torts, piece by piece," and held instead that the plaintiffs had "plainly satisfie[d] the demands of Article III" because they had alleged the same "*types* of harms protected at common law." *Id.* at 653–54 (emphasis added).

Judge Oldham reached the same conclusion—by the same route—in a TCPA-related decision for the Fifth Circuit. There, the court held that a single unsolicited text message in violation of the TCPA bore a sufficiently close relationship to the common-law tort of public nuisance. *See Cranor*, 998 F.3d at 690. In doing so, the court freely acknowledged that the statute didn't duplicate the common-law tort in every jot and tittle. *Id.* at 692. In particular, the court held that although the harm alleged didn't "interfere with those who come in contact with [the nuisance] in the exercise of a public right or . . . otherwise affect[] the interests of the community at large"—as is required for public-nuisance claims, *see* Restatement (Second) of Torts § 821B cmt. g—the plaintiff's allegations bore "enough" of a relationship to the common-law tort to support Article III standing, *see Cranor*, 998 F.3d at 692. In so holding, the Fifth Circuit emphasized that the concreteness inquiry should be "focused on *types* of harms protected at common law, not the precise point at which those harms become actionable." *Id.* at 693 (emphasis added) (quoting *Krakauer*, 925 F.3d at 654).

In the same way, the Eighth Circuit held that the harm identified by § 1692f(1) of the FDCPA—which prohibits debt collectors' attempts to collect amounts not actually owed—bore a sufficiently close relationship to common-law "unjustifiable-litigation torts" like abuse of process, wrongful use of civil proceedings, and malicious prosecution. *See Demarais*, 869 F.3d at 691. Importantly here, it did so notwithstanding the fact that an attempt to collect a debt not owed lacks essential elements of common-law unjustifiable-litigation claims—perhaps most notably, that it doesn't "set[] the machinery of the law in motion," involve the "use [of] legal process," or require "making a charge before a public official or body." Restatement (Second) of Torts §§ 653 (malicious prosecution), 674 (wrongful use of civil proceedings), 682 (abuse of process); *see also Demarais*, 869 F.3d at 691.

Likewise, in *In re Horizon Healthcare Services*, the Third Circuit concluded that violations of certain provisions of the FCRA governing credit-card companies' dissemination of personal information bore a close relationship to invasion-of-privacy torts. *See* 846 F.3d at 639–40. In doing so, the court acknowledged that although neither the applicable provisions of the FCRA nor the plaintiffs' specific allegations involved the dissemination of information that was damaging to one's reputation or otherwise offensive—which privacy torts ordinarily require—the harms nonetheless satisfied *Spokeo*'s "close relationship" test. *See id.* at

24                    Newsom, J., Dissenting                    19-14434

639 (noting that "[w]e are not suggesting that Horizon's actions would give rise to a cause of action under common law").

Most recently—and in fact, since *TransUnion* was decided—the Tenth Circuit held that the harm resulting from an unwelcome phone call bore a close relationship to the tort of intrusion upon seclusion. *Lupia*, 8 F.4th at 1191. The court there emphasized that "[t]hough a single phone call may not intrude to the *degree* required at common law, that phone call poses the same *kind* of harm recognized at common law." *Id.* at 1192 (first emphasis added). In so holding, the Tenth Circuit distinguished *TransUnion* on the ground that the defendants there hadn't disclosed *any* information regarding the larger subset of plaintiffs to *anyone* and, accordingly, that the harm identified by those plaintiffs "differed in kind" from the harm of defamation. *Id.*[7]

_____

[7] It's worth noting that this Court's lone foray into the kind-degree waters—while not perfectly free of ambiguity—is consistent with our sister circuits' decisions. In *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), which today's majority opinion curiously never even mentions, we held that receipt of a single unwelcome text message didn't bear a sufficiently close relationship to any of a handful of common-law torts. *Id.* at 1171. To that extent, the Court reached a bottom-line conclusion different from those reached by the Fifth and Seventh Circuits in *Cranor* and *Gadelhak*, respectively. More important for our purposes than *Salcedo*'s result, though—this isn't a TCPA case, after all, and the en banc court isn't bound by our prior decisions, in any event—is the panel's analysis. To be sure, the opinion there suggested in one place that the plaintiff's allegations "f[e]ll short of th[e] degree of harm" that intrusion upon seclusion ordinarily entails, *id.* at 1171, and in another that a "significant[]" difference in "degree" might disqualify an intangible-injury

19-14434                Newsom, J., Dissenting                25

★  ★  ★

Perhaps the majority just rejects the kind-degree framework that our sister circuits have embraced. Perhaps not. It's impossible to say from its opinion, which resolutely refuses to engage it. It may be that the majority sidesteps the kind-degree framework because it knows that it has to—at least if it intends to retain any tether to Supreme Court precedent. It's hard to imagine a circumstance in which a plaintiff's harm is similar in *both* "kind" and "degree" to a common-law tort and yet is *not* precisely the

---

plaintiff, *id.* at 1172. But the balance of the opinion emphasized that only an alleged harm that is "categorically distinct" from a common-law comparator would scuttle a plaintiff's standing. *Id.* Concerning the torts of trespass and nuisance, for instance, the panel stressed that they were different from the plaintiff's alleged harm "both in kind and in degree." *Id.* at 1171. So too, the panel said, with respect to both invasion of privacy in general and intrusion upon seclusion in particular, "an examination of those torts reveals significant differences in the *kind and degree* of harm they contemplate providing redress for." *Id.* at 1172 (emphasis added). Perhaps most tellingly, the *Salcedo* opinion concluded by expressly rejecting any suggestion that a plaintiff's standing turns on "how small or large [his] injury is" and emphasizing that the key criterion is quality, not quantity: "Our assessment today is thus qualitative, not quantitative. We have assessed how concrete and real the alleged harm is and we have concluded that it is not the *kind* of harm that constitutes an injury in fact." *Id.* at 1173 (emphasis added) (citation omitted). Notably, in *Gadelhak*, now-Justice Barrett interpreted *Salcedo*—just as I do here—to hold that an alleged harm and a common-law tort must be similar in kind, but not in degree. *See Gadelhak*, 950 F.3d at 462 ("In rejecting standing in a similar case, the Eleventh Circuit suggested that the tort of intrusion upon seclusion addressed only invasions of privacy like eavesdropping and spying, which pose a different kind of harm altogether.").

same—the majority certainly hasn't pointed to one.  The majority's wooden element-for-element approach—which amounts to a similar-in-*both*-kind-*and*-degree standard—thus can't be reconciled with *Spokeo*'s prescription of a "close" (but not identical) relationship, 578 U.S. at 341, with *TransUnion*'s reminder that "we do not require an exact duplicate" between the alleged injury and a traditionally recognized harm, 141 S. Ct. at 2209, or, for that matter, with our own one-time recognition that the fit between a plaintiff's statutory claim and a "pedigreed common-law cause of action need not be perfect," *Muransky*, 979 F.3d at 926.

In any event, today's majority effectively leaves this Court on the short side of (by my count) a 7-1 circuit split.  To be clear, I'm not averse to breaking with our sister circuits when necessary—our obligation is to the law, not to what other courts have said about the law. *See, e.g.*, *Romero v. Secretary, U.S. Dep't of Homeland Sec.*, 20 F.4th 1374, 1382 n.5 (11th Cir. 2021) (Newsom, J.) (expressly rejecting Fifth and D.C. Circuits' interpretations of 8 U.S.C. § 1101(g)).  But if we're going to reject a framework that so many of our colleagues have adopted as a means of implementing the *Spokeo*/*TransUnion* "close relationship" criterion—and, for that matter, the framework embraced and utilized by the parties to this very case—we should do so openly and unashamedly.  We should acknowledge that framework,

19-14434                Newsom, J., Dissenting                27

explain our reasons for repudiating it, and offer a meaningful alternative. Today's majority does none of those things.[8]

One final word about the majority's implicit rejection of the kind-degree analysis—and its explicit adoption of a rigid jot-for-jot, element-for-element test: Not only does it defy Supreme Court precedent, and not only does it spurn the post-*Spokeo*/ *TransUnion* consensus among the circuits, it also deprives Congress of *any* authority to innovate. Under the majority's *de facto* perfect-match criterion, Congress has essentially no freedom to recognize new judicially enforceable rights. Rather, it is relegated to the role of scrivener, dutifully replicating and codifying preexisting common-law causes of action. Should Congress enact a statute that targets the same *kind* of harm that a common-law claim addressed, but permit protected parties to deviate even one *degree* from a single element of that common-law forebear, it will have overstepped its constitutional authority. That, it seems to me, cannot possibly be the law.

---

[8] Seemingly nodding to would-be cert-opposition authors, the majority insists that I have "manufacture[d]" the circuit split that I describe. *See* Maj. Op. at 25. Tellingly, though, it does so without actually engaging any of our sister circuits' decisions, and instead merely asserts that they offer "no uniform test." *Id.* at 26. Needless to say, I disagree. As explained in text, those decisions offer a coherent and principled framework—even if some (but not all) of them fail to incant certain magic words, *contra id.* at 26 n.10—with which today's majority opinion is irreconcilable.

C

On, finally, to deciding Hunstein's case—or at least to how I would decide Hunstein's case. Under the sensible (and until today, consensus) kind-degree approach to the *Spokeo/TransUnion* "close relationship" standard, Hunstein has standing here. The majority concludes otherwise not only by forsaking the kind-degree framework in favor of what amounts to a perfect-match test, but also in refusing to give Hunstein's complaint an appropriately charitable reading and, worse, just flat disregarding its express allegations.

On the face of his complaint, Hunstein has alleged a harm that is similar in kind—even if not in precise degree—to the common-law tort of public disclosure of private facts. To repeat, under that tort, "[o]ne who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D. As already explained, the majority agrees (or at least doesn't disagree) that Hunstein's allegations satisfy the highly-offensive and not-of-public-concern elements. The lone question, therefore, is about "publicity." And to repeat—which I do because the majority's treatment so often seems to obscure the point—the question is *not* whether Hunstein's allegations satisfy that element sufficiently to state a common-law public-disclosure claim on the merits. Rather, it is whether, at the pleadings stage, Hunstein's

allegations, and any reasonable inferences therefrom, come "close enough" to that element to give him Article III standing to sue.

Again, Hunstein claims that a debt collector, Preferred, "disclosed" what he calls "sensitive medical information"—including, most notably, the status of Hunstein's debt, his minor son's name, and that his debt arose from his son's medical treatment—to "the employees of an unauthorized third-party mail house," CompuMail. Pl.'s Compl. at 5. That means, based on the allegations of the complaint—which we must accept as true for purposes of this appeal—that *some* measure of disclosure in fact occurred. *See, e.g.*, *Munson v. Lathrop*, 71 N.W. 596, 597 (Wis. 1897) ("The writing of the message, and the delivery of it by him to the [telegraph] company for transmission, as mentioned, was a publication of the same."). To be sure, Preferred's disclosure of Hunstein's private information to CompuMail's employees might have been less widespread—less "public"—than the disclosures typical of actionable public-disclosure-of-private-facts claims. But that is a matter of "degree"; dissemination of personal information to a third-party's employees and more widespread dissemination of that same personal information—and thus the harms that those disclosures can cause—remain similar in "kind."[9]

---

[9] To be clear, there is no one-size-fits-all formula for determining just how widespread the dissemination must be to constitute "publicity" under the common law: "[T]he extent of the required publicity to support a claim of public disclosure of private facts varies from jurisdiction to jurisdiction." *Fernandez-Wells v. Beauvais*, 983 P.2d 1006, 1008 (N.M. App. 1999); *see also,*

30                    Newsom, J., Dissenting                    19-14434

For its part, the majority never disputes any of this—because, again, it never confronts it. What the majority does do, unfortunately, is ignore the actual allegations of—and thus badly misconstrue—Hunstein's complaint. The majority *repeatedly* asserts that Hunstein's complaint alleges only a disclosure from one inanimate company, Preferred, to its inanimate "vendor," CompuMail—and, accordingly, the majority says, even giving his complaint what it calls the "most generous reading," it can't infer that "even a single person at the mail vendor knew about [his] debt," Maj. Op. at 27.[10] Indeed, the majority goes so far as to say that Hunstein's complaint's "allegations stop there." *Id.* at 20.

_____

*e.g.*, *Karch v. BayBank FSB*, 794 A.2d 763, 774 (N.H. 2002) ("[D]etermining whether a disclosure of a private matter has become one of public knowledge does not, as a matter of law, depend on the number of people told. Whether publicity is achieved by broadcasting something private to a few people or to the masses is a conclusion best reached by the trier of fact."). In any event, for purposes of the "close enough" analysis, we needn't get wrapped around the axle about precisely how much disclosure would suffice to state a common-law tort claim. It's enough that Hunstein has alleged something similar.

[10] *See also* Maj. Op. at 3 ("The plaintiff alleges that a creditor sent information about his debt to a mail vendor . . . ."); *id.* at 4 ("[T]he collection agency sent its vendor several pieces of information . . . ."); *id.* at 4-5. ("He alleged that Preferred Collection had disclosed information about his debt to a third party—the mail vendor . . . ."); *id.* at 5 ("The district court granted [the] motion to dismiss . . . because the communication to the mail vendor . . . ."); *id.* at 15 ("Hunstein alleges that . . . Preferred Collection sent information about his debt to a mail vendor . . . ."); *id.* at 16 ("[Hunstein] says that by sending the information about his debt to the mail vendor . . . ."); *id.* at 20 ("His complaint says that Preferred Collection placed his personal information

19-14434                Newsom, J., Dissenting                31

That's just not true. Hunstein's complaint didn't just allege that Preferred disclosed his private information to some disembodied Borg—"the vendor." To the contrary, his complaint alleged—in the very first substantive paragraph under the heading "Preferred's Violations of the FDCPA"—that "Preferred violated 15 U.S.C. § 1692c(b) when it disclosed information about Mr. Hunstein's purported ACH debt *to the employees* of an unauthorized third-party mail house in connection with the collection of the Debt." Pl.'s Compl. at 5 (emphasis added and omitted).[11]

---

'within the possession of an unauthorized third-party' . . . ."); *id.* at 22 ("[T]he complaint describes a disclosure that reached a single intermediary . . . ."); *id.* ("Hunstein did not even allege that a single employee ever read or understood the information about his debt."); *id.* ("Under even the most generous reading of his complaint, one company sent his information to another . . . ."); *id.* at 27 ("Preferred Collection's disclosure to its vendor . . . ."); *id.* at 27 ("Nor is it clear, or even likely, that even a single person at the mail vendor knew about the debt . . . .").

[11] It's no answer to say that "the rest of the allegations" negate Hunstein's lead disclosure-to-employees contention. *Contra* Maj. Op. at 21. The majority's assertion that the follow-on allegations "show" that Preferred's disclosure of Hunstein's private information was merely "an electronic transfer between two companies"—*i.e.*, Borg to Borg—doesn't withstand scrutiny. *See id.* Nor does the concurring opinion's accusation that I am "ignor[ing] specific allegations that clarify the general one [I] pluck[] out of context." Pryor Concurring Op. at 8. Warning: Long footnote ahead. This is a sideshow, but it's an important one.

*First*, there's nothing in Hunstein's complaint that even remotely compels the conclusion that a "bare electronic conveyance of information" is

all that occurred. *Id.* at 9; *see also* Maj. Op. at 21 ("electronic transfer"). The word "populate"—on which the concurrence seems to predicate its bare-electronic-conveyance contention, *see* Pryor Concurring Op. at 9—means only "to import data into (a database)" or to "provide (a database) with content." *Populate*, Oxford English Dictionary (online ed.). Nothing about that word requires (or even necessarily implies) automation, let alone a "bare electronic conveyance of information." Indeed, individuals—*i.e.*, human beings—manually "populate" forms with information in all sorts of everyday circumstances: at a doctor's office, in filling out a questionnaire, when buying something online, etc. So I fail to understand why Hunstein's complaint can't fairly be read to assert that the same CompuMail "employees" to whom Preferred disclosed his private information received and read that information before manually populating it into the necessary template.

*Second*, both the majority and the concurrence rely on Hunstein's lawyer's statements at oral argument to prop up their position that CompuMail's employee couldn't possibly have read or perceived the information that Preferred transmitted to them. *See* Maj. Op. at 21; Pryor Concurring Op. at 9. It wasn't long ago, though, that one of my colleagues (successfully) insisted that we "cannot rely on [an] inquisition" that takes place "at oral argument." *United States v. Campbell*, 26 F.4th 860, 889 (11th Cir. 2022) (en banc) (Pryor, C.J., concurring). If that is indeed the rule, it is particularly applicable (in a way that it wasn't in *Campbell*) to Hunstein's lawyer's equivocal oral-argument responses to the judges' questions. True, when pressed, Hunstein's lawyer conceded that his complaint was "inartfully drafted" and that he hadn't explicitly "alleged that anyone read or perceived" the information. Oral Arg. at 7:30–45, 9:15. But both the majority and the concurrence here fail to acknowledge that the lawyer also agreed that the complaint's allegations permit the "rational inference" that Hunstein's information "was read." *Id.* at 5:25–6:05; *see also id.* at 8:05–50 (reiterating that he was not "walking away from" the inference that the information was "disclosed [to] or read by employees," emphasizing that the complaint's disclosure-to-employees allegation was "very relevant," and responding "no" when asked whether he was "disclaiming it").

19-14434                    Newsom, J., Dissenting                    33

The majority's refusal to meaningfully reckon with Hunstein's employees-based allegation is odd, given that the since-vacated panel opinion addressed it repeatedly and in detail. *See Hunstein*, 17 F.4th at 1020, 1021, 1027, 1028 & n. 7, 1029, 1031. Be that as it may, the allegation is significant—not nearly as easily shrugged off as the majority seems to think. As already noted, Hunstein's standing here turns on whether he has alleged a harm that bears a "close" (though not identical) relationship to public disclosure of private facts—and, in particular, to that tort's "publicity" element. Importantly here, that element is satisfied where private information is communicated *either* "to the public at large" *or* "to so many persons that the matter must be regarded

---

*Finally*, and most fundamentally, why do the majority and concurrence insist on squinting so hard at Hunstein's complaint, parsing it in a way that denies him standing at the pleading stage? It's possible, I suppose, that if Hunstein's case had proceeded, Preferred might have been able to demonstrate that CompuMail *is* just a bot-filled warehouse and that, in fact, no human "employees" ever "actually read" his information. *TransUnion*, 141 S. Ct. at 2210 n.6. If so, it might have been entitled to summary judgment or a trial victory, just as TransUnion was. *See id.*; *see also supra* at 9–10. But of course Hunstein's case never made it that far, and that's just *not* what he alleged in his complaint—or, at the very least, it's not the only reasonable inference that can be drawn from his complaint. And given that we must accept the facts alleged "as true and draw *all* reasonable inferences in [Hunstein's] favor," their stingy reading is inappropriate at the motion-to-dismiss stage. *Royal Caribbean Cruises*, 931 F.3d at 1043 (quotation omitted; emphasis added).

as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a.

Again, at the pleading stage, we must not only accept the facts alleged in Hunstein's complaint as true but also draw all reasonable inferences in his favor. *Royal Caribbean Cruises*, 931 F.3d at 1043. In light of that familiar standard, two important points: First, given that Hunstein has alleged a disclosure to an as-yet-undetermined number of CompuMail's "employees," it's not at all too "generous" to infer—contra the majority—that those living, breathing, thinking individuals both "read [and] understood the information about his debt." Maj. Op. at 22. To be honest, I don't know what other inference we *could* draw from that allegation at this juncture of the case. Second, the *Restatement* expressly ties the publicity element, as one of two alternative ways of demonstrating it, to how "many persons" received the plaintiff's private information. *See* Restatement (Second) of Torts § 652D cmt. a. At this early phase of the litigation, we have no way of knowing how many employees CompuMail even has—let alone how many of them saw Hunstein's information. What if that number were 100? Or 500? Or 10,000? What if Preferred had disclosed to 10,000 CompuMail employees not just Hunstein's son's name and the fact of his hospitalization but also the particulars of his medical diagnosis and prognosis? Still no "publicity"? Come on.

To be clear, I'm not suggesting that publicity is purely a "numbers game." Maj. Op. at 20. But even the majority admits—

19-14434                Newsom, J., Dissenting                35

as it must given the *Restatement*'s plain terms—that the "number" of individuals to whom private information is disclosed at least bears on the publicity question. In the majority's words:

> To be sure, dissemination of information to many people is *one way* publicity can occur. But a disclosure to many people *may still be* private, or at least not "publicity." Although the number of people who receive information *may be* relevant when examining the question of publicity, it does not itself reveal whether a given disclosure qualifies as public.

Maj. Op. at 19 (emphasis added). As the majority's tentative, conditional language indicates, the breadth of any particular disclosure is a matter of *degree*, not *kind*—and thus, at least in the way that I (and many of my colleagues across the country) think about it, not a basis for refusing a plaintiff standing to sue.[12]

---

[12] The majority counters with an example: A "trade secret . . . communicated to thousands of new employees after a merger," it says, would not support a public-disclosure claim. Maj. Op. at 19. That may well be correct, but not for the reason the majority seems to think.

As the Supreme Court noted in *TransUnion*, intra-company disclosures typically aren't "actionable publications," at least for defamation purposes. 141 S. Ct. at 2210 n.6 (citing *Chalkley v. Atl. Coast Line R.R. Co.*, 143 S.E. 631, 638–39 (Va. 1928)). That's not, though, because they aren't "publications"; rather, it's because (as the Supreme Court's own cited case demonstrates) they aren't "actionable." *Id.*; *see also* Restatement (Second) of Torts § 577 cmt. e ("The fact that the defamatory matter is communicated to an agent of the defamer does not prevent it from being a publication . . . ."). And the actionable/non-actionable distinction turns on whether a particular

---

communication is *privileged*. *See Chalkley*, 143 S.E. at 638–39. Irrespective of whether a publication is privileged or not, and thus actionable or not, it remains a *publication*. Restatement (Second) of Torts § 577 cmt. n ("One who is privileged to communicate defamatory matter publishes the matter, even though the publication is privileged.").

Privilege seems to play a similar (though not quite identical) role in the public-disclosure context. For reasons I've explained, absent any privilege issue, a sufficiently widespread intra-company disclosure—*i.e.*, "to so many persons" that it "reaches, or is sure to reach, the public," *id.* § 652D cmt. a—might well satisfy the public-disclosure tort's "publicity" element. To the extent that the majority's trade-secret hypothetical would fail to support a public-disclosure claim, that's because the secret's recipients would be privileged to receive it—and, in turn, would be bound by privilege not to further disclose it. In that circumstance, we might rightly conclude that the privileged information isn't "sure to reach[] the public." To be clear, though, that conclusion turns on the nature of the information at issue—privileged vs. non-privileged—not, as the majority seems to assume, on the nature of the disclosure—intra- vs. extra-company. Separately, to the extent the majority's trade-secret hypo has resonance, it may be because, as would almost surely be the case, a trade secret wouldn't satisfy the public-disclosure tort's requirement that its dissemination be "highly offensive to a reasonable person." *Cf., e.g.*, *Wolfe v. Schaefer*, 619 F.3d 782, 784 (7th Cir. 2010) (stating that "unreasonable publicity given to another's private life" is "illustrated by," for example, "the unauthorized publicizing of a person's medical condition" or his "personal finances"). That element, too, turns on the nature of the information disclosed, not the nature of the disclosure itself.

Perhaps a counter-counterexample will demonstrate the limits of (and flaws in) the majority's logic: If Google were to communicate to all of its 100,000-plus employees a *non*-privileged piece of information—say, for example, a user's entire internet-search history—I think we can agree we'd have an actionable public disclosure on our hands, and certainly something "close enough" to confer Article III standing.

★  ★  ★

Giving Hunstein the benefit of the doubt, as we must at this stage of the proceedings, it's not at all unreasonable to infer that Preferred's disclosure of Hunstein's private information to an as-yet-undetermined number of CompuMail's "employees"—*i.e.*, "persons" within the meaning of *Restatement (Second) of Torts* § 652D cmt. a—could well lead to that information becoming more broadly "public." In my view, that's sufficiently "close" to public disclosure's "publicity" element—at least as a matter of "kind, [if] not degree," *Gadelhak*, 950 F.3d at 462—to give Hunstein Article III standing to sue.

### III

It's easy to get lost in the weeds as we delve into the finer points of common-law causes of action, compare allegations to elements, etc. But remember, our job is *not* to determine whether Hunstein has stated a viable common-law tort claim. (He hasn't even *brought* a common-law tort claim.) Rather, our task is to compare the "harm" that Congress targeted in the FDCPA and that Hunstein asserts with the "harm" that the common law sought to address—and, in particular, to determine whether those harms bear a sufficiently "close relationship." *TransUnion*, 141 S. Ct. at 2209. Hunstein alleges that his privacy was compromised when his intensely private information was disclosed to a group of strangers. That's the same sort of harm that common-law invasion-of-privacy torts—and in particular, public disclosure of private facts—aim to remedy. To be sure, just as the disclosure that Hunstein alleged

might have been less extensive than that typically associated with a common-law invasion-of-privacy claim, the harm that Hunstein experienced may have been less severe. But those, again, are differences in *degree*, not *kind*.

Today's opinion empties the *Spokeo*/*TransUnion* "close relationship" standard of all subtlety, adopts what is, in effect, the very "exact duplicate" standard that the Supreme Court has forbidden and that we had earlier forsworn, places this Court on the wrong side of a 7-1 circuit split, and, in the doing, denies Congress any meaningful ability to innovate, leaving it only to replicate and codify existing common-law causes of action.

I respectfully dissent.